BRYAN J. HARRISON, ESQ. (SBN 277312)
*Bryan@h-klaw.com*
EDI P. KRISTOPHER, ESQ.  (SBN 284833)
*Edi@h-klaw.com*
**HARRISON | KRISTOPHER, LLP**
301 E Colorado Blvd Ste 323
Pasadena CA  91101
Phone: (866) 529-6155
FAX:   (866) 565-6206

HOSSEIN KHATAMI, ESQ. (SBN 278350)
*Hoss@hosslaw.com*
**HOSS LAW, P.C.**
2140 Professional Dr Ste 150
Roseville CA  95661
Phone: (916) 788-4445
FAX:   (916) 788-4447

Attorneys for Plaintiffs, THE ESTATE OF
JOSEPH REAGAN, by and through Chelsea
August, Successor-in-Interest to Decedent Joseph
Reagan; and CHELSEA AUGUST as an individual

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

## SACRAMENTO DIVISION

| | |
|---|---|
| THE ESTATE OF JOSEPH REAGAN, by and through Chelsea August, Successor-in-Interest to Decedent Joseph Reagan; CHELSEA AUGUST as an individual, <br><br> Plaintiffs, <br><br> v. <br><br> CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION (CDCR), an agency of the State of California; ROBERT ST. ANDRE, Warden of High Desert State Prison; and DOES 1 to 20, individually, jointly, and severally, <br><br> Defendants. | Case No.:  2:25-cv-03429-JAM-CKD <br><br> **PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR LEAVE TO FILE FIRST AMENDED COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** <br><br> Date:  Tuesday, April 21, 2026 <br> Time:  1:00 a.m. <br> Dept:  Courtroom 6, 14th Floor <br> Judge: The Hon. John A. Mendez <br><br> *[Submitted on the papers pursuant to Local Rule 230(g) unless the Court orders otherwise.]* <br><br> Complaint filed:  November 26, 2025 |

**NOTICE OF MOTION AND**

**MOTION FOR LEAVE TO FILE FIRST AMENDED COMPLAINT**

TO THE COURT, ALL PARTIES, AND TO THEIR ATTORNEYS OF RECORD HEREIN:

PLEASE TAKE NOTICE that Plaintiffs THE ESTATE OF JOSEPH REAGAN, by and through Chelsea August, Successor-in-Interest, and CHELSEA AUGUST as an individual, will move this Court, before the Honorable John A. Mendez, United States District Judge, Eastern District of California, Sacramento Division, for an Order granting leave to file the First Amended Complaint ("FAC") lodged as Docket 18 on March 2, 2026. The hearing on this motion shall occur on April 21, 2026, at 1:00 p.m., at the Robert T. Matsui United States Courthouse, in Courtroom 6, on the 14th floor, located at 501 "I" Street, in Sacramento, California  95814, before the Hon. John A. Mendez, District Judge.

This Motion is made pursuant to the Federal Rules of Civil Procedure, rule 15(a)(2), and is based upon this Notice, the Memorandum of Points and Authorities set forth below, the Declaration of Bryan J. Harrison in support thereof, the pleadings and records on file in this action, and such other evidence and argument as may be presented at the time of the hearing of this Motion. Pursuant to Local Rule 230(g), this Motion may be submitted on the papers without oral argument unless the Court orders otherwise.

Respectfully submitted,


Dated: March 13, 2026                    **HARRISON | KRISTOPHER, LLP**


                                         By: _____
                                             Bryan J. Harrison, Esq.,
                                             Attorney for Plaintiffs, THE ESTATE OF
                                             JOSEPH REAGAN, by and through Chelsea
                                             August, Successor-in-Interest to Decedent
                                             Joseph Reagan; and CHELSEA AUGUST as
                                             an individual

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    INTRODUCTION

Plaintiffs respectfully move this Court for leave to file the First Amended Complaint ("FAC"), which was lodged as Docket 18 on March 2, 2026. The FAC directly and comprehensively addresses the arguments advanced by Defendants in their pending Motion to Dismiss, cures the structural deficiencies identified therein, and presents a well-pleaded, viable set of claims arising from the preventable and brutal death of JOSEPH REAGAN at High Desert State Prison on June 10, 2025.

Leave to amend should be freely granted under Federal Rules of Civil Procedure, rule 15(a)(2). Every relevant factor supports amendment:  No trial date has been set; no scheduling order has been entered; no discovery has occurred; no Rule 26(f) conference has taken place; and, Defendants have not yet filed an answer to any version of the Complaint. The FAC was filed prior to any meaningful expenditure of litigation resources by either party. The amendments are not futile – they are directly responsive to Defendants' own objections and state cognizable claims under both federal and California law. Defendants bear the burden of demonstrating why amendment should not be granted, and they cannot meet that burden here. *DCD Programs, Ltd. v. Leighton*, 833 F.2d 183, 187 (9th Cir. 1987). Justice requires that Plaintiffs be permitted to present the full strength of their case.

### II.    FACTUAL AND PROCEDURAL BACKGROUND

Joseph Reagan was a 44-year-old man incarcerated at High Desert State Prison ("HDSP") in Susanville, California. In the weeks preceding his death, Reagan was injured in a physical altercation with HDSP correctional officers, leaving him confined to a wheelchair and entirely dependent upon correctional staff for his physical safety. Reagan filed an administrative grievance and a government tort claim against CDCR arising from that altercation.

On June 10, 2025, Reagan was attacked in the dayroom by inmate Bryan Cook – a documented violent offender serving a life sentence for second-degree murder – using an inmate-manufactured weapon. Cook stabbed Reagan multiple times, inflicting fatal injuries.

The attack was prolonged and violent, lasting a sufficient duration for other inmates to audibly call for help. Correctional officers assigned to Reagan's housing unit allegedly closed the control booth windows, failed to activate emergency alarms, failed to intervene, and delayed the summons of medical care. Reagan was pronounced deceased at 7:17 p.m.

Reagan's death was not isolated. Under Warden Robert St. Andre's tenure at HDSP, four inmates were killed in materially similar circumstances between May 2024 and April 2025, each involving inmate-manufactured weapons and systemic failures of classification, supervision, and contraband control. A CDCR-wide contraband sweep in March 2025 recovered over 100 inmate-manufactured weapons across 11 high-security prisons, including HDSP; no corrective measures were implemented.

Plaintiffs filed their original Complaint on November 26, 2025. Defendants filed a Motion to Dismiss on January 30, 2026, raising the Eleventh Amendment immunity of CDCR as to federal claims, the scope of Warden St. Andre's supervisory liability, and the adequacy of the institutional policy/custom allegations. The FAC was filed on March 2, 2026, as Docket 18, responding directly to each of those objections.

The FAC was filed based on a good-faith belief, shared by both attorneys of record for Plaintiffs, that an agreement had been reached during meet-and-confer communications establishing March 2, 2026, as a filing deadline in this matter. Defendants' counsel has disputed that understanding. The instant motion is filed to cure any procedural defect and to obtain formal leave to file the FAC.

## III.    <u>LEGAL STANDARD</u>

Federal Rules of Civil Procedure, rule 15(a)(2), provides that a court "should freely give leave [to amend] when justice so requires." The Supreme Court has recognized that this mandate reflects a strong policy favoring resolution of claims on the merits. *Foman v. Davis*, 371 U.S. 178, 182 (1962). Leave to amend "should be denied only if the amendment: (1) Prejudices the opposing party; (2) is sought in bad faith; (3) produces an undue delay in litigation; or (4) is futile." *AmerisourceBergen Corp. v. Dialysist West, Inc.*, 465 F.3d 946, 951 (9th Cir. 2006).

The Ninth Circuit accords "considerable weight" to the liberal amendment policy and has held that "the non-moving party bears the burden of showing why amendment should not be granted." *DCD Programs, Ltd. v. Leighton*, 833 F.2d 183, 187 (9th Cir. 1987). Absent a "strong showing" of one of the *Foman* factors, leave should be granted. *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003). Courts in the Eastern District of California have consistently applied this liberal standard. See *Rangel v. Gonzalez Mascorro*, 274 F.R.D. 585, 589–90 (E.D. Cal. 2011).

Prejudice to the opposing party is "the most critical" of the *Foman* factors. *Eminence Capital*, 316 F.3d at 1052. Where no prejudice is shown, the other factors carry diminished weight. *Id.*

## IV.  **ARGUMENT**

### A.  **Defendants Will Suffer No Prejudice From Amendment – The Most Critical *Foman* Factor**

Prejudice to the opposing party is the most critical factor under the Ninth Circuit's amendment jurisprudence. *Eminence Capital*, 316 F.3d at 1052. Here, there is none. The following undisputed facts of record establish the absence of any cognizable prejudice to Defendants:

First, no scheduling order under Federal Rules of Civil Procedure, rule 16, has been entered. Second, no Rule 26(f) conference has occurred and no initial disclosures have been exchanged. Third, no discovery of any kind has taken place. Fourth, Defendants have not filed an answer to any version of the Complaint. Fifth, no trial date has been set. Sixth, the FAC is already on the docket as Docket 18 and Defendants have had full notice of its contents since March 2, 2026 – ample time to evaluate the pleading on its merits. Granting leave does not require either party or the Court to redo any prior work.

The Ninth Circuit has consistently held that amendment is not prejudicial at the early pleading stage, particularly where no answer has been filed and no discovery has occurred. *Howey v. United States*, 481 F.2d 1187, 1190 (9th Cir. 1973). This case squarely fits that paradigm. Defendants' opposition to leave – at a stage where they have incurred virtually no

litigation costs beyond preparing a motion to dismiss that they would have had to file in any event – does not constitute the kind of prejudice that warrants denial under *Foman*.

**B.  The Motion Is Made in Good Faith and Without Undue Delay**

The FAC was filed on March 2, 2026, based on a good-faith understanding, shared by both Plaintiffs' attorneys of record, that an amended pleading deadline had been established through meet-and-confer communications in this matter. While Defendants' counsel has since disputed that understanding, attributing the March 2 deadline to an agreement in the related matter of *Mercado v. CDCR* (S.D. Cal., Case No. 3:26-cv-00059), Plaintiffs' counsel acted without any intent to circumvent the Court's procedures. No dilatory motive was present; the FAC was drafted and filed promptly following Defendants' Motion to Dismiss, and it is substantively responsive to the very arguments raised in that motion.

Where a party mistakenly but in good faith files an amended pleading, courts within the Ninth Circuit routinely grant leave to amend nunc pro tunc or treat the already-filed pleading as operative, particularly where there is no prejudice to the opposing party. *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 701 (9th Cir. 1990) (leave to amend freely given absent bad faith or prejudice). The delay, if any, between January 30 and March 2 is minimal and arose from the parties' ongoing discussions about the procedural path forward – not from any dilatory conduct by Plaintiffs.

**C.  The Proposed Amendment Is Not Futile**

An amendment is futile only if it would not survive a motion to dismiss under Federal Rules of Civil Procedure, rule 12(b)(6). *Miller v. Rykoff-Sexton, Inc.*, 845 F.2d 209, 214 (9th Cir. 1988). The futility inquiry at the Rule 15 stage is not an adjudication of the merits; it asks only whether the pleading is facially plausible. See *Netbula, LLC v. Distinct Corp.*, 212 F.R.D. 534, 539 (N.D. Cal. 2003). The FAC readily clears that threshold on all principal causes of action.

**1.  Eleventh Amendment – Resolved**

The FAC expressly resolves the Eleventh Amendment concerns identified in Defendants' Motion to Dismiss. All federal claims under section 1983 of title 42 of the

United States Code are asserted exclusively against individual defendants in their individual capacities. CDCR is named as a defendant solely for:  (a) Vicarious liability on state law claims under California Government Code section 815.2(a); (b) direct institutional liability for hiring, training, and supervision; and, (c) prospective injunctive relief under *Ex Parte Young*, 209 U.S. 123 (1908). This is precisely the framework required under *Will v. Michigan Dep't of State Police*, 491 U.S. 58 (1989), and its progeny.

### 2.  <u>Supervisory Liability – Substantially Strengthened</u>

The FAC substantially strengthens the supervisory liability theory against Warden St. Andre by pleading his personal acts and omissions with particularity:  His personal receipt of use-of-force reports regarding Reagan's prior altercation with HDSP officers; his personal receipt of notification of Reagan's government tort claim; his personal knowledge of four prior inmate homicides at HDSP under his tenure; and his personal knowledge of the results of the contraband sweep in March 2025. These are not generalized policy allegations; they are individualized, facts specific to Joseph Reagan that satisfy the supervisory liability standard of *Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011), and distinguish this case from the conclusory allegations found deficient in *Iqbal*, 556 U.S. at 678.

### 3.  <u>Deliberate Indifference – Well-Pleaded</u>

The FAC satisfies both the objective and subjective components of *Farmer v. Brennan*, 511 U.S. 825 (1994). Objectively, a wheelchair-bound inmate housed in the same unit as a documented murderer, in a facility where contraband weapons circulate freely and four inmates had been killed in the preceding thirteen months, faces a substantial risk of serious harm. Subjectively, St. Andre and the Doe Officers knew of this risk through incident reports, contraband sweep results, classification records, and use-of-force documentation, and disregarded it. The FAC's allegations of affirmative acts of coercion – closing control booth windows, refusing to activate emergency alarms, deliberate non-intervention – satisfy *Iqbal's* plausibility standard.

///

///

### 4. State Law Claims – Viable

The claims under the Tom Bane Civil Rights Act (Cal. Civ. Code, § 52.1), failure to summon medical care under Government Code section 845.6, negligence, wrongful death, and intentional infliction of emotional distress are each properly pleaded. CDCR's general immunity under Government Code section 844.6(a)(2) is overcome by the express exception in section 845.6. The discretionary immunity defense under section 820.2 does not apply to the operational and ministerial failures alleged against St. Andre – specifically, his failure to act on known, specific risks after receiving individualized reports about Reagan. *Walsh v. Tehachapi Unified Sch. Dist.*, 827 F.Supp.2d 1107, 1122 (E.D. Cal. 2011). To the extent Defendants invoke section 820.8 supervisory immunity, that immunity does not bar claims premised on an employee's own negligent or wrongful acts or omissions. California Government Code section 820.8.

### 5. Prospective Injunctive Relief – Cognizable at the Pleading Stage

The FAC invokes *Ex Parte Young*, 209 U.S. 123 (1908) for prospective relief against state officers in their official capacities for ongoing unconstitutional conditions at HDSP. The standing challenge that Defendants are likely to raise – that the Estate and Chelsea August cannot represent the interests of current and future HDSP inmates – is more appropriately resolved on a fully briefed motion to dismiss than at the leave-to-amend stage, where the futility threshold requires only a showing that the claim is not clearly foreclosed. See *Nebula*, 212 F.R.D. at 539.

### D. The Interests of Justice and Judicial Economy Favor Amendment

The underlying facts of this case – a wheelchair-bound man repeatedly stabbed to death in a state prison dayroom while officers allegedly looked the other way – compel resolution on the merits. Rule 15's liberal amendment standard exists precisely to ensure that meritorious claims are not defeated by technical pleading deficiencies at the outset of litigation.

Moreover, granting leave to amend promotes judicial economy by permitting the Court to evaluate the case as it actually stands, avoiding a second round of pleading motions

directed at the original complaint and conserving the resources of both the Court and the parties. *Jackson v. Bank of Hawaii*, 902 F.2d 1385, 1387 (9th Cir. 1990). The FAC presents a more complete and legally precise version of Plaintiffs' claims. Denying leave would force piecemeal litigation – potentially multiple rounds of pleading motions – without any corresponding benefit to the Court or to Defendants.

Courts in this Circuit have repeatedly confirmed that close cases should be resolved in favor of amendment. *Griggs v. Pace Am. Grp., Inc.*, 170 F.3d 877, 880 (9th Cir. 1999) ("[I]n exercising its discretion with respect to the grant or denial of leave to amend, a court must be guided by the underlying purpose of rule 15 – to facilitate decision on the merits rather than on the pleadings or technicalities."). This is not a close case. All *Foman* factors weigh uniformly in Plaintiffs' favor.

## V.    **CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that this Court enter an order:  (1) Granting Plaintiffs leave to file the First Amended Complaint; (2) deeming the First Amended Complaint filed as Docket 18 to be the operative pleading in this action as of March 2, 2026; and (3) granting such other and further relief as the Court deems just and proper.

Respectfully submitted,


Dated: March 13, 2026                     **HARRISON | KRISTOPHER, LLP**


By: _____
         Bryan J. Harrison, Esq.,
         Attorney for Plaintiffs, THE ESTATE OF
         JOSEPH REAGAN, by and through Chelsea
         August, Successor-in-Interest to Decedent
         Joseph Reagan; and CHELSEA AUGUST as
         an individual

1    **<u>DECLARATION OF BRYAN J. HARRISON IN SUPPORT OF PLAINTIFFS'</u>**

2    **<u>MOTION FOR LEAVE TO FILE FIRST AMENDED COMPLAINT</u>**

3    I, Bryan J. Harrison, declare as follows:

4        1.    I am an attorney duly licensed to practice law in the State of California and

5    before this Court. I am a partner at Harrison | Kristopher, LLP, and am one of the

6    attorneys of record for Plaintiffs in this action. I make this declaration based upon my

7    personal knowledge and, where indicated, upon my review of the files and records

8    maintained in this matter. If called as a witness, I could and would testify competently to the

9    facts set forth herein.

10       2.    Plaintiffs filed their original Complaint in this action on November 26, 2025.

11    Defendants California Department of Corrections and Rehabilitation and Warden Robert

12    St. Andre subsequently filed a Motion to Dismiss on January 30, 2026, raising arguments

13    concerning, among other issues, Eleventh Amendment immunity as applied to CDCR, the

14    scope of supervisory liability, and the sufficiency of the institutional policy allegations.

15       3.    Following the filing of the Motion to Dismiss, I engaged in meet-and-confer

16    communications with counsel for Defendants regarding the procedural path forward in this

17    matter. It was my understanding – shared by my co-counsel, Hossein Khatami, Esq. – that

18    the parties had reached an agreement in the context of those discussions establishing March

19    2, 2026, as a deadline for Plaintiffs to file an amended complaint in this case.

20       4.    In reliance on that understanding, Plaintiffs' First Amended Complaint was

21    prepared and filed on March 2, 2026, as Docket 18 in this action.

22       5.    On or about March 10, 2026, I received a communication from John W.

23    Faulconer, Deputy Attorney General, advising that the March 2 deadline reflected in his

24    records pertained to a separate matter, *Mercado v. CDCR*, Case No. 3:26-cv-00059-H-AHG

25    (S.D. Cal.), and not to this action. Mr. Faulconer indicated that Defendants intend to oppose

26    any motion for leave to amend.

27       6.    I have reviewed my records and am unable to locate a written communication

28    confirming the March 2 deadline as applied specifically to this action, as distinguished from

the *Mercado* matter. I do not attribute bad faith to opposing counsel; I believe the discrepancy arose from a miscommunication in the course of discussions involving multiple related cases being litigated concurrently across different districts.

7.    The First Amended Complaint (Dkt. 18) was prepared in good faith and is directly responsive to the arguments raised in Defendants' Motion to Dismiss. It does not add new parties or entirely new theories of liability; it refines the existing claims to address the specific deficiencies identified by Defendants in their Motion to Dismiss.

8.    No scheduling order has been entered in this action under Federal Rules of Civil Procedure, rule 16. No Rule 26(f) conference has taken place. No initial disclosures have been exchanged. No discovery of any kind has occurred. No trial date has been set. Defendants have not answered any version of the complaint. Granting leave to amend will not require any party to redo any prior work or delay any scheduled proceeding.

9.    A true and correct copy of the First Amended Complaint, lodged as Docket 18, is attached hereto as Exhibit A and incorporated by reference.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 13th day of March, 2026, at Pasadena, California, by

_____

Bryan J. Harrison, Declarant

**EXHIBIT A**

BRYAN J. HARRISON, ESQ. (SBN 277312)
*Bryan@h-klaw.com*
EDI P. KRISTOPHER, ESQ.  (SBN 284833)
*Edi@h-klaw.com*
**HARRISON | KRISTOPHER, LLP**
301 E Colorado Blvd Ste 323
Pasadena CA  91101
Phone: (866) 529-6155
FAX:   (866) 565-6206

HOSSEIN KHATAMI, ESQ. (SBN 278350)
*Hoss@hosslaw.com*
**HOSS LAW, P.C.**
2140 Professional Dr Ste 150
Roseville CA  95661
Phone: (916) 788-4445
FAX:   (916) 788-4447

Attorneys for Plaintiffs, THE ESTATE OF
JOSEPH REAGAN, by and through Chelsea
August, Successor-in-Interest to Decedent Joseph
Reagan; and CHELSEA AUGUST as an individual

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

**SACRAMENTO DIVISION**

| | |
|---|---|
| THE ESTATE OF JOSEPH REAGAN, by and through Chelsea August, Successor-in-Interest to Decedent Joseph Reagan; CHELSEA AUGUST as an individual,<br><br>Plaintiffs,<br><br>v.<br><br>CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION (CDCR), an agency of the State of California; ROBERT ST. ANDRE, Warden of High Desert State Prison; and DOES 1 to 20, individually, jointly, and severally,<br><br>Defendants. | Case No.:  2:25-cv-03429-JAM-CKD<br><br>**FIRST AMENDED COMPLAINT FOR VIOLATIONS OF CIVIL AND CONSTITUTIONAL RIGHTS, AND DEMAND FOR TRIAL BY JURY** |

1    COME NOW Plaintiffs, THE ESTATE OF JOSEPH REAGAN, by and through

2   Chelsea August, Successor-in-Interest to Decedent Joseph Reagan; and CHELSEA

3   AUGUST as an individual, for themselves and themselves alone, and allege as follows:

### INTRODUCTION

5    1.    JOSEPH REAGAN (REAGAN) was killed by incarcerated person, BRYAN

6   COOK (COOK), on June 10, 2025, while in the custody of the CALIFORNIA

7   DEPARTMENT OF CORRECTIONS AND REHABILITATION as an incarcerated

8   person at the High Desert State Prison ("HDSP"), under the supervision of Warden

9   ROBERT ST. ANDRE and the CALIFORNIA DEPARTMENT OF CORRECTIONS

10  AND REHABILITATION ("CDCR").

### JURISDICTION & VENUE

12   2.    This Court has jurisdiction of the federal claims under section 1331 of title 28

13  of the United States Code (in that they arise under the United States Constitution) and

14  section 1343(a)(3) of title 28 of the United States Code (in that the action is brought to

15  address deprivations, under color of state authority, of rights, privileges, and immunities

16  protected by the U.S. Constitution). This Court has supplemental jurisdiction of the state law

17  claims under section 1367 of title 28 of the United States Code.

18   3.    Venue is proper in the United States District Court for the Eastern District of

19  California pursuant to section 1391(b) of title 28 of the United States Code because

20  Defendants are located in the Eastern District of California and because many of the acts

21  and/or omissions described herein occurred in the Eastern District of California.

22   4.    Intradistrict venue is proper in the Sacramento Division of the Eastern

23  District of California pursuant to Local Rule 120(d) because the claims asserted herein arise

24  from the acts and/or omissions which occurred in the County of Lassen, California.

### ADMINISTRATIVE REMEDIES

26   5.    Plaintiffs, THE ESTATE OF JOSEPH REAGAN; CHELSEA AUGUST,

27  timely presented their government claims on September 5, 2025, pursuant to the State of

28

California, Department of General Services, Office of Risk & Insurance Management, Government Claims Program (Gov. Code, § 910 et seq.).

6.    The State failed to provide a written response within the time prescribed by Government Code section 912.4, accordingly, the claims are deemed rejected pursuant to Government Code section 912.4(c).

## **PARTIES**

7.    Plaintiff THE ESTATE OF JOSEPH REAGAN appears by and through the real-party-in-interest, Plaintiff CHELSEA AUGUST, the biological daughter of JOSEPH REAGAN, who brings this action pursuant to California Code of Civil Procedure section 377.30. A declaration of heirship is attached hereto as Exhibit 1 and is incorporated by reference.

8.    Plaintiff CHELSEA AUGUST brings this action as the Successor-in-Interest on behalf of the decedent JOSEPH REAGAN.

9.    Plaintiff is the proper successor-in-interest to JOSEPH REAGAN, pursuant to California Code of Civil Procedure section 377.11. Plaintiff brings these claims individually and as Successor-in-Interest for JOSEPH REAGAN, Deceased, and the claims are brought pursuant to California Code of Civil Procedure sections 377.20 et seq. and 377.60 et seq., which provide for survival and wrongful death actions. The survival and wrongful death claims all survive the death of JOSEPH REAGAN and all arise from the same wrongful act or neglect of another; and such claims are properly joined pursuant to California Code of Civil Procedure section 377.62. The claims set forth below are also brought by Plaintiff, individually and on behalf of Decedent JOSEPH REAGAN, on the basis of sections 1983 and 1988 of title 42 of the United States Code, the United States Constitution, and federal and state civil rights law. The declaration regarding Plaintiff CHELSEA AUGUST's status as JOSEPH REAGAN's successor-in-interest pursuant to California Code of Civil Procedure section 377.32 is attached hereto as Exhibit 1 and is incorporated herein by reference.

///

10.     Plaintiff CHELSEA AUGUST is a resident of the County of Merced, California, and is a citizen of the United States and is a competent adult.

11.     Defendant BRYAN COOK, at all times herein mentioned, was a resident of Lassen County, California.

12.     Defendant CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION is located in the State of California.

13.     Defendant CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION is a "public entity," pursuant to California Government Code section 811.2.

14.     High Desert State Prison ("HDSP") is a state prison in Susanville, California. HDSP is a maximum-supermax security institution, opened in August 1995 and houses over 1,800 high-security custody incarcerated people. It is operated under the supervision of Defendant CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION.

15.     Defendant ROBERT ST. ANDRE was, at all times material herein, the warden for the HDSP, acting within the scope of employment and under color of state law. Defendant ROBERT ST. ANDRE is sued in an individual capacity.

16.     Defendants DOES 1 through 20 are and/or were agents, contractors, or employees of Defendants HDSP, and/or the CDCR, acting within the scope of agency or employment and under color of state law. Defendants DOES 1 through 20 are sued by fictitious names and their true and correct names and identities will be substituted when ascertained.

## ELEVENTH AMENDMENT LIMITATION ON CDCR LIABILITY

17.     Defendant CDCR, as the California Department of Corrections and Rehabilitation, is an agency of the State of California and constitutes an arm of the state for purposes of Eleventh Amendment immunity. See *Will v. Michigan Dep't of State Police* (1989) 491 U.S. 58, 70. The Eleventh Amendment bars this Court from awarding monetary damages against CDCR on any claim arising under section 1983 of title 42 of the United

States Code or the United States Constitution. Accordingly, CDCR is named as a defendant in this action solely for the following limited purposes:

        a.   **Vicarious Liability for State Law Claims:**  CDCR may be held vicariously liable for monetary damages under California Government Code section 815.2(a) for the negligent, wrongful, and intentional tortious acts of its employees acting within the scope of employment, as alleged in the Third through Eighth Causes of Action;

        b.   **Direct Institutional Liability:**  CDCR may be held directly liable for its own institutional failures in hiring, training, and supervision of employees, as alleged in the Sixth Cause of Action (Negligence); and,

        c.   **Prospective Injunctive Relief:**  CDCR officials in their official capacities may be ordered to provide prospective injunctive and declaratory relief to prevent ongoing constitutional violations under the doctrine of *Ex Parte Young* (1908) 209 U.S. 123, as alleged in the Ninth Cause of Action.

18.    CDCR is not subject to monetary damages for violations of federal constitutional rights. All federal constitutional claims under section 1983 of title 42 of the United States Code are asserted exclusively against individual defendants in their individual capacities.

### CDCR VICARIOUS LIABILITY (STATE LAW ONLY)

19.    Defendant CDCR is liable under California Government Code section 815.2(a) for the negligent and wrongful acts and omissions of its employees, agents, and representatives acting within the scope of their employment, as alleged in the state law causes of action (Third through Eighth Causes of Action). CDCR is also directly liable for its own institutional negligence in hiring, training, and supervising employees (Sixth Cause of Action). See *C.A. v. William S. Hart Union High Sch. Dist.*, 53 Cal.4th 861, 879 (2012) (a public entity may be vicariously liable under section 815.2 for the negligence of its supervisory employees in hiring, supervising, and retaining an unfit employee). CDCR is not subject to liability for monetary damages on any federal constitutional claim.

**LIABILITY OF INDIVIDUAL DEFENDANTS (FEDERAL AND STATE LAW)**

20.    Defendants ROBERT ST. ANDRE and DOES 1 through 20, acting in their individual capacities, are personally liable for their own acts and omissions that violated DECEDENT's and PLAINTIFFS' rights under the United States Constitution and California law. These individual defendants acted under color of state law and are subject to liability for compensatory and punitive damages, as alleged in the First, Second, Third, Fourth, Fifth, Sixth, Seventh, and Eighth Causes of Action.

**STATUTORY FRAMEWORK:**

**EXCEPTIONS TO IMMUNITY AND MINISTERIAL DUTIES**

21.    ***Government Code section 845.6 – Exception to Prisoner-Injury Immunity:*** California Government Code section 844.6(a)(2) provides that a public entity is generally not liable for "an injury to any prisoner." However, Government Code section 845.6 creates an express statutory exception to this general immunity, imposing liability on both public employees and public entities when an employee "knows or has reason to know that a prisoner is in need of immediate medical care and he fails to take reasonable action to summon such medical care." *See Lawson v. Superior Court* (2010) 180 Cal.App.4th 1372, 1383 (recognizing that § 845.6 creates an affirmative duty that overrides § 844.6 immunity); *Castaneda v. Dep't of Corrections & Rehabilitation* (2013) 212 Cal.App.4th 1051, 1069–1070 (same). Plaintiffs' Third Cause of Action is brought pursuant to this statutory exception.

22.    ***Ministerial vs. Discretionary Duties – Government Code section 820.2:*** Government Code section 820.2 provides immunity to public employees for injuries resulting from the exercise of discretion vested in them. However, this immunity "is reserved for those basic policy decisions which have been expressly committed to coordinate branches of government" and does not extend to operational or ministerial failures to carry out established policies. *Johnson v. State of California* (1968) 69 Cal.2d 782, 793–794. The distinction is between "planning" decisions (immune) and "operational" decisions implementing those plans (not immune). *Id.* As alleged herein, the failures attributed to Defendant ST. ANDRE are not "basic policy decisions" entitled to discretionary immunity.

1   Rather, they constitute operational and ministerial failures to enforce and carry out existing

2   mandatory regulations and established institutional protocols, including without limitation:

3   California Code of Regulations, title 15, section 1027 (staffing requirements), section 1027.5

4   (mandatory safety checks at prescribed intervals), section 1050 (classification plan), and

5   section 1053 (administrative separation of at-risk inmates); the CDCR Department

6   Operations Manual provisions governing contraband detection, use-of-force reporting, and

7   emergency response; and HDSP-specific post orders mandating dayroom supervision,

8   CCTV monitoring, and regular housing-unit walk-throughs. ST. ANDRE's failures were not

9   decisions about *whether* to have safety checks, classification procedures, or contraband

10  protocols – those policy decisions had already been made and codified in binding

11  regulations. His failures were the operational failure to *implement, enforce, and comply with* those

12  existing mandates. Such operational failures are not entitled to discretionary immunity under

13  section 820.2. *See Haggis v. City of Los Angeles* (2000) 22 Cal.4th 490, 498–499 (distinguishing

14  immune policy decisions from non-immune operational failures).

15      23.    **Personal vs. Vicarious Liability – Government Code section 820.8:**

16  Government Code section 820.8 provides that a public employee is generally not liable for

17  injury caused by the act or omission of another person. However, section 820.8 expressly

18  preserves liability for injury "proximately caused by [the employee's] own negligent or

19  wrongful act or omission." As alleged herein, Defendant ST. ANDRE is not named on state

20  law claims as a mere supervisor vicariously liable for the acts of subordinates. Rather, ST.

21  ANDRE is personally liable for his own independent acts and omissions that directly and

22  proximately caused REAGAN's injuries and death. ST. ANDRE's personal failures include:

23  his personal failure to enforce mandatory safety-check protocols after receiving reports of

24  four prior inmate homicides under his command; his personal failure to ensure compliance

25  with classification and housing-separation requirements despite knowledge that vulnerable

26  inmates were being housed with violent offenders; his personal failure to implement

27  corrective action following the March 2025 contraband sweep results; and his personal

28  failure to take any action in response to the use-of-force incident involving REAGAN and

the subsequent government tort claim filed against the institution. These are ST. ANDRE's own independent failures, not merely supervisory responsibility for the failures of others.

## **GENERAL ALLEGATIONS**

24.     At all times relevant herein, all wrongful actions described were performed under color of state law and/or in concert with or on behalf of those acting under the color of state law.

25.     JOSEPH REAGAN was a 44-year-old man, prior to his death on June 10, 2025.

26.     At all times relevant herein, JOSEPH REAGAN faced a substantial risk of serious harm while incarcerated at HDSP. This risk arose from multiple, overlapping factors known to Defendants, including:  (a) REAGAN's wheelchair-bound condition, which rendered him physically incapable of defending himself or fleeing from attack; (b) his prior physical altercation with HDSP correctional officers and his pending administrative grievance and/or government claim against the CDCR, which created a known risk of retaliation and marked him as a potential target; (c) the documented presence and circulation of inmate-manufactured weapons within HDSP housing units; (d) the housing of known violent offenders, including BRYAN COOK, in the same unit as vulnerable inmates like REAGAN; and (e) the pattern of inmate-on-inmate homicides at HDSP in the months preceding REAGAN's death, each involving inmate-manufactured weapons and failures of classification, supervision, and contraband control. Defendants knew of each of these risk factors and either actually appreciated, or were deliberately indifferent to, the substantial risk of serious harm they posed to JOSEPH REAGAN.

### **The Attack**

27.     The allegations contained in the following paragraphs regarding the attack are asserted in part on information and belief, except where otherwise indicated.

28.     On or about June 10, 2025, JOSEPH REAGAN and BRYAN COOK were both incarcerated within the same housing unit at HDSP. Although they were not cellmates, they were regularly placed in close proximity to one another and shared access to the same

dayroom and common areas under the supervision of HDSP correctional staff. At all relevant times, COOK was serving a life sentence with the possibility of parole for second-degree murder and was documented by CDCR staff as a violent and high-risk inmate.

29.    Upon information and belief, HDSP maintains daily shift rosters, post assignment logs, and housing unit staffing records that identify by name the correctional officers assigned to JOSEPH REAGAN's housing unit during each shift. The attack on REAGAN occurred during the evening shift on June 10, 2025. Upon information and belief, Defendants DOES 1 through 20 include the officers specifically assigned to the control booth, dayroom supervision, and floor patrol within REAGAN's housing unit during the evening shift on June 10, 2025. These officers had daily, direct contact with REAGAN and were personally aware of his wheelchair-bound condition, his prior altercation with HDSP staff, and his pending administrative grievance and/or government claim. The identities of these officers are known to Defendants and are contained in institutional records exclusively within Defendants' possession, custody, and control, and will be substituted for the Doe designations upon completion of discovery.

30.    Upon information and belief, the closed-circuit television ("CCTV") system in REAGAN's housing unit recorded the entirety of the June 10, 2025, attack in real time with associated timestamps. Institutional video logs maintained by HDSP will establish the precise moment the attack commenced, the duration of the assault, and the elapsed time between the onset of the attack and the first documented officer response. Upon information and belief, the CCTV recordings will confirm that the attack was visible on surveillance monitors continuously accessible to Defendants DOES 1 through 20 for a period of several minutes before any correctional officer took action to intervene, summon assistance, or activate emergency protocols. The video evidence is in the exclusive possession, custody, and control of Defendants.

31.    Upon information and belief, HDSP maintains electronic logs of all personal body alarm activations, institutional alarm activations, radio communications, and medical emergency dispatches, each with corresponding timestamps. Upon information and belief,

1 these logs will confirm that no personal body alarm was activated, no institutional emergency

2 alarm was triggered, no radio call for assistance was made, and no medical emergency was

3 declared by any correctional officer during the period of the attack on JOSEPH REAGAN.

4 The complete absence of any alarm activation or emergency communication during a

5 prolonged, violent assault on a wheelchair-bound inmate – in a dayroom equipped with

6 surveillance cameras and within audible range of the control booth – corroborates the

7 reasonable inference that Defendants DOES 1 through 20 deliberately chose not to respond

8 rather than failing to detect the attack. These records are in the exclusive possession,

9 custody, and control of Defendants.

10       32.    In the weeks prior to the June 10, 2025 incident, JOSEPH REAGAN was

11 involved in a physical altercation with HDSP correctional officers during which he sustained

12 serious injuries that confined him to a wheelchair. As a result of the injuries he sustained

13 during that altercation, REAGAN filed an administrative grievance and/or a government

14 claim against the CDCR pursuant to Government Code section 910 et seq., seeking

15 compensation for his injuries. Upon information and belief, JOSEPH REAGAN's claim and

16 the underlying altercation were known to correctional staff within his housing unit, including

17 Defendants DOES 1 through 20, and engendered hostility toward JOSEPH REAGAN

18 among HDSP personnel.

19       33.    As a direct result of his injuries and consequent immobility, JOSEPH

20 REAGAN was substantially more vulnerable to assault and unable to defend himself or

21 evade harm. REAGAN's wheelchair-bound condition was open and obvious to all

22 correctional staff who observed him in the housing unit. CDCR officials and staff knew, or

23 reasonably should have known, of his debilitated physical condition, his pending grievance

24 or claim against the CDCR arising from staff conduct, and the heightened risk that his

25 physical limitations and adversarial relationship with the institution made him a target for

26 harm. Despite this knowledge, Defendants failed to provide appropriate protective custody

27 or housing accommodations to mitigate his vulnerability.

28 ///

34.     On June 10, 2025, while JOSEPH REAGAN remained wheelchair-bound, inmate BRYAN COOK launched a violent and sustained attack against him in the dayroom area using an inmate-manufactured weapon. BRYAN COOK stabbed JOSEPH REAGAN multiple times, inflicting fatal injuries. The assault was prolonged and violent, lasting a sufficient duration to attract the attention of multiple inmates within the unit, who audibly called for assistance from correctional officers.

35.     During the attack, Correctional Officers DOES 1 through 20 failed to intervene or take reasonable measures to protect JOSEPH REAGAN. Upon information and belief, their failure to act was willful and deliberate, motivated by retaliatory animus arising from REAGAN's prior physical altercation with HDSP staff and his subsequent administrative claim and/or government claim against the CDCR. The following acts and omissions, considered in light of REAGAN's known vulnerability, his pending claim against the institution, and standard correctional protocols, support the reasonable inference that Defendants' inaction was intentional rather than negligent:

a. ***Intentionally closing control booth windows prior to or during the attack on JOSEPH REAGAN***. The control booth is the nerve center of the housing unit, designed to provide correctional officers with visual and auditory access to all areas where inmates are present. By physically closing the windows, Defendants DOES 1 through 20 deliberately severed their ability to hear JOSEPH REAGAN's cries for help, the shouts of other inmates calling for assistance, and the sounds of the violent assault. This was not a passive failure to observe; it was an affirmative act designed to insulate Defendants from any obligation to respond. Defendants used their exclusive control over the housing unit's security infrastructures to ensure that REAGAN's pleas for help would go unanswered.

b. ***Affirmatively deciding not to conduct required security checks and housing unit walk-throughs mandated by the Department Operations Manual and applicable CDCR policies, including***

1   *California Code of Regulations, title 15, section 1027.5 (Safety*

2   *Checks)*. These checks are not discretionary; they are mandatory safety

3   measures designed to detect and prevent precisely the type of violence that

4   killed JOSEPH REAGAN. Defendants DOES 1 through 20 made a

5   conscious decision to disregard these mandatory duties, thereby ensuring

6   that no officer would physically enter the dayroom area, observe the

7   attack, or intervene on REAGAN's behalf. Their deliberate abandonment

8   of required protocols functioned as a tool of coercion, using institutional

9   authority to strip REAGAN of the protective oversight to which he was

10  entitled.

11  c.  **Refusing to deploy authorized force to halt the attack on JOSEPH**

12  **REAGAN, despite possessing both the means and the legal duty to**

13  **do so**. Correctional officers at HDSP are trained and equipped to respond

14  to inmate-on-inmate violence, including through the use of physical

15  intervention, chemical agents, and lethal force if necessary to prevent death

16  or serious bodily injury. Defendants DOES 1 through 20 possessed these

17  tools and the training to use them. When confronted with a prolonged,

18  deadly assault on a wheelchair-bound inmate, they affirmatively chose to

19  withhold intervention. This was not hesitation or delayed reaction; it was a

20  deliberate refusal to exercise the coercive power of the state for its

21  intended protective purpose, while simultaneously ensuring that

22  REAGAN – locked in a housing unit under Defendant's exclusive control

23  – had no alternative means of protection or escape.

24  d.  **Deliberately refraining from activating personal body alarms or**

25  **institutional emergency alarm systems, despite awareness that**

26  **JOSEPH REAGAN was being attacked**. Every correctional officer at

27  HDSP is equipped with a personal body alarm capable of instantly

28  summoning emergency response from throughout the institution.

Institutional alarm systems exist for the same purpose. These systems require only the push of a button to activate. Defendants DOES 1 through 20 made the affirmative decision not to push that button – not because they were unaware of the attack, but because they chose to let it continue. By deliberately withholding access to emergency response systems that only they could activate, Defendants wielded their institutional authority as an instrument of coercion, ensuring that REAGAN would receive no aid from the broader prison staff.

e. ***Intentionally disregarding dayroom surveillance cameras that displayed the attack on JOSEPH REAGAN in real time***. The dayroom was equipped with closed-circuit television providing a live video feed to the control booth and facility security rooms. Defendants DOES 1 through 20 were assigned to monitor these feeds as part of their duties. The prolonged and violent nature of the assault on REAGAN – a wheelchair-bound man being repeatedly stabbed – would have been unmistakably visible on the surveillance monitors. Defendants either deliberately averted their eyes from the monitors or observed the attack and consciously chose not to respond. In either case, their conduct was not mere inattention; it was the purposeful decision to ignore visual evidence of a murder in progress, using their roles as the exclusive monitors of institutional surveillance to ensure that no response would be initiated.

f. ***Making the affirmative classification and housing decision to place JOSEPH REAGAN – a wheelchair-bound inmate who had recently filed a grievance and/or government claim against CDCR arising from a physical altercation with correctional staff – in the same housing unit and dayroom as BRYAN COOK, a documented violent offender serving a life sentence for second-degree murder***. CDCR

1    classification and housing-separation policies, including title 15, sections

2    1050 and 1053, exist precisely to prevent such dangerous pairings.

3    Defendants DOES 1 through 20, and/or supervisory personnel acting at

4    the direction of or with the acquiescence of Defendant ST. ANDRE,

5    deliberately disregarded these mandatory regulations when assigning

6    REAGAN's housing. This was not an administrative oversight; it was a

7    purposeful decision to expose a vulnerable, physically impaired inmate to

8    foreseeable violence from a known dangerous offender, in deliberate

9    contravention of mandatory regulations designed to protect inmates like

10    REAGAN.

11    g.  **Receiving and consciously disregarding prior warnings,**

12       **administrative grievances, and communications from JOSEPH**

13       **REAGAN and other inmates indicating that REAGAN feared for his**

14       **safety**. Upon information and belief, REAGAN or other inmates

15       communicated to correctional staff that REAGAN felt unsafe following

16       his altercation with HDSP officers and the filing of his grievance and/or

17       government claim, and that he faced potential threats from other inmates.

18       Defendants DOES 1 through 20 received these communications and

19       made the deliberate decision to take no protective action – no housing

20       reassignment, no protective custody evaluation, no enhanced monitoring.

21       By receiving REAGAN's pleas for protection and affirmatively choosing

22       to deny them, Defendants used their gatekeeping authority over inmate

23       safety measures as an instrument of coercion and intimidation,

24       communicating to REAGAN that the institution would not protect him.

25    h.  **Deliberately delaying the dispatch of medical and custody personnel**

26       **after becoming aware that JOSEPH REAGAN had been attacked**

27       **and was suffering from life-threatening injuries**. Once Defendants

28       became aware of the attack – whether through auditory cues, surveillance

monitoring, or reports from other inmates – they possessed the exclusive ability to summon medical assistance. REAGAN, wheelchair-bound and bleeding from multiple stab wounds, could not summon help himself. Other inmates, locked in their cells or the dayroom, could not summon help. Only Defendants could activate the institutional response. They chose not to do so promptly. This deliberate delay – measured in minutes during which REAGAN bled and suffered – was an affirmative exercise of coercive control over REAGAN's access to medical care, using Defendant's exclusive authority over emergency response to prolong his suffering and ensure his death.

36.    The totality of circumstances – including REAGAN's pending administrative grievance and/or government claim against the CDCR, his prior physical altercation with correctional officers, his open and obvious wheelchair-bound condition rendering him entirely dependent on staff for protection, the failure of multiple officers to respond to audible calls for help, and the deviation from mandatory security protocols – gives rise to a reasonable inference that Defendants DOES 1 through 20 acted with deliberate indifference to REAGAN's safety, or, alternatively, with retaliatory intent arising from his adversarial relationship with the institution.

37.    Following the incident, medical staff administered life-saving measures to JOSEPH REAGAN, who had sustained multiple stab wounds consistent with the use of an inmate-manufactured weapon. He was transported to the institution's medial triage and treatment area for emergency care. Despite these interventions, JOSEPH REAGAN was pronounced deceased at approximately 7:17 p.m. by on-scene medical personnel. An inmate-manufactured weapon was recovered from the scene.

**In-Custody Death**

38.    Defendants CDCR and ROBERT ST. ANDRE are responsible for taking charge of correctional facilities and the inmates in it, and are answerable for the inmate's

safekeeping, including pursuant to California law and the CDCR Department Operations

Manual.

39.    Defendants CDCR and ROBERT ST. ANDRE are responsible for

supervising all aspects of the correctional facilities under their care and for staffing, training,

supervising, and developing policies and customs at the correctional facilities related to

inmates' safekeeping, including, for example, ensuring that contraband is not permitted to

enter correctional facilities; that inmates are properly classified and housed based on an

adequate risk/threat assessment; and that inmates are adequately and timely monitored.

### Deliberate Indifference Under *Farmer v. Brennan*

40.    The Eighth Amendment's prohibition against cruel and unusual punishment

imposes a duty on prison officials to protect inmates from violence at the hands of other

inmates. *Farmer v. Brennan* (1994) 511 U.S. 825, 833. A prison official violates this duty when

two requirements are met: (1) the deprivation alleged is, objectively, sufficiently serious – i.e.,

the inmate faces conditions posing a substantial risk of serious harm; and (2) the prison

official is, subjectively, deliberately indifferent to that risk – i.e., the official knows of and

disregards an excessive risk to inmate health or safety. *Id.*, at 834, 837.

41.    A prison official may be held liable if the official knew of a substantial risk

from the very fact that the risk was obvious. Farmer, 511 U.S. at 842. Whether a prison

official had the requisite knowledge is a question of fact subject to demonstration in the

usual ways, including inference from circumstantial evidence. *Id.*, at 842. As alleged herein,

Defendants' knowledge of the substantial risk to REAGAN is established by both direct

evidence (communications, grievances, institutional reports) and circumstantial evidence (the

obviousness of the risk given REAGAN's physical condition, housing assignment, and the

pattern of violence at HDSP). In the supervisory context, "a plaintiff may state a claim

against a supervisor for deliberate indifference based upon the supervisor's knowledge of

and acquiescence in unconstitutional conduct by his or her subordinates." *Starr v. Baca*,

652 F.3d 1202, 1207 (9th Cir. 2011). "[W]hen a supervisor is found liable based on deliberate

indifference, the supervisor is being held liable for his or her own culpable action or

inaction, not held vicariously liable for the culpable action or inaction of his or her

subordinates." *Id.*

42.    On or about January 15, 2009, JOSEPH REAGAN was booked as an

incarcerated person into the High Desert State Prison, located at 475-750 Rice Canyon

Road, in Susanville, California  96127.

43.    Defendants DOES 1 through 20, HDSP personnel, were responsible for

classifying and assigning housing for JOSEPH REAGAN.

44.    Following JOSEPH REAGAN's injuries and resulting wheelchair-bound

condition (which arose from a prior physical altercation with HDSP correctional officers),

Defendants DOES 1 through 20 nonetheless continued to classify, assign, and house him

with the general population, exposing him to unrestricted interaction with other inmates in

dayrooms and communal spaces. Such conduct was undertaken in reckless and blatant

disregard for REAGAN's safety, given his physical limitations and known vulnerability to

assault.

45.    Upon information and belief, REAGAN's housing assignment within HDSP

was determined by a classification committee composed of correctional staff, including one

or more of the Defendants DOES 1 through 20, and/or personnel acting at the direction of

or with the acquiescence of Defendant ST. ANDRE. Upon information and belief,

REAGAN's most recent classification hearing and housing assignment occurred after his

physical altercation with HDSP correctional officers and after his resulting wheelchair-bound

condition was documented in his central file. The classification committee reviewed, or had

access to and was required to review, REAGAN's central file, which documented his

wheelchair-bound condition, the circumstances of his prior altercation with staff, his

pending administrative grievance and/or government tort claim, and other risk factors.

Despite these documented risk factors, the committee assigned REAGAN to general

population housing in the same unit as BRYAN COOK – a documented violent offender

serving a life sentence for second-degree murder – without protective measures, enhanced

monitoring, or consideration of alternative placement. The identities of the classification

committee members who made this decision, the date of the classification hearing, and the records of the committee's deliberations are contained in institutional records exclusively within Defendants' possession, custody, and control.

46. Defendants DOES 1 through 20 acted with deliberate indifference to JOSEPH REAGAN's safety and security. They made intentional decisions concerning his housing and confinement conditions that created a substantial risk of serious harm, and they failed to take reasonable and available measures to mitigate those risks. Their omissions included, but were not limited to:

    a. Failing to investigate known or potential threats to REAGAN's safety based on his condition and prior conflicts with staff and inmates;

    b. Failing to review and cross-reference the classification and disciplinary files of REAGAN and other inmates, including BRYAN COOK, before housing them in the same unit or permitting shared dayroom access;

    c. Failing to consult available institutional sources such as custody records, threat assessments, and inmate alerts regarding compatibility and safety concerns; and

    d. Failing to reclassify or assign REAGAN to protective custody or other secure housing despite clear indications of heightened risk.

47. In classifying and assigning housing for JOSEPH REAGAN, Defendants DOES 1 through 20 failed to adhere to applicable CDCR policies, training standards, and procedures, including those set forth in the Department Operations Manual governing inmate classification, housing, and safety assessments. Their actions and omissions were unreasonable, reckless, and a substantial factor in causing REAGAN's injuries and death.

48. On or about June 10, 2025, JOSEPH REAGAN was housed in the general population at HDSP, where he was routinely exposed to unrestricted interaction with other inmates during dayroom and other communal activities. This included regular contact with inmate BRYAN COOK, who was also assigned to the same housing unit.

///

49.     At all relevant times, HDSP, under the direction and supervision of the CDCR and Warden ROBERT ST. ANDRE, suffered from chronic and pervasive security lapses. These included the routine circulation of contraband, such as inmate-manufactured weapons, narcotics, and other prohibited materials, which were readily accessible to incarcerated persons. These dangerous conditions were long-standing, well-documented, and known to CDCR leadership and custody staff, who failed to take effective corrective action.

50.     As a direct result of these systemic security failures, inmate BRYAN COOK had ready and foreseeable access to a deadly inmate-manufactured weapon within the dayroom and common areas he shared with JOSEPH REAGAN. The June 10, 2025 attack was carried out using one such weapon, a contraband instrument that would not have been available but for Defendants' failure to implement and enforce adequate search, inspection, and contraband-control measures.

51.     Defendants CDCR, Warden ROBERT ST. ANDRE, and DOES 1 through 20 owed JOSEPH W. REAGAN a non-delegable duty of care to maintain a reasonably safe and secure correctional environment free from foreseeable inmate violence and from the introduction and circulation of weapons and other contraband. This duty included the obligation to develop, implement, and enforce institutional policies and practices requiring regular searches, random inspections, staff training, and continuous monitoring of inmate movement and common areas.

52.     Defendants CDCR, Warden ST. ANDRE, and DOES 1 through 20, through their acts and omissions, breached their duty of care by failing to detect, remove, and prevent the presence of contraband weapons within HDSP. Their failure to conduct adequate searches, to monitor housing units, and to enforce mandatory security protocols directly enabled inmate COOK to possess and use a deadly weapon in the dayroom, resulting in the fatal attack on JOSEPH REAGAN.

53.     At the time of the attack, JOSEPH REAGAN remained wheelchair-bound and physically incapacitated as a result of injuries sustained in a prior altercation with HDSP correctional officers. His impaired mobility rendered him unable to defend himself, flee

from danger, or seek safety, a condition that was known or should have been known to all custody staff and supervisors. Despite this knowledge, Defendants failed to take any precautionary measures to protect him from foreseeable harm.

54. Defendants DOES 1 through 20 acted with deliberate indifference to JOSEPH REAGAN's safety and security. They made intentional decisions regarding the conditions of his confinement that created an obvious and substantial risk of serious harm, including but not limited to:

    a. Failing to search inmates, including BRYAN COOK, and their cells for contraband prior to dayroom access;

    b. Failing to search all persons, including staff, contractors, and visitors, entering or exiting the housing unit for contraband;

    c. Failing to conduct required inspections and monitoring of the dayroom and other common areas known to be used for concealing or circulating weapons; and,

    d. Failing to consider or act upon known risks arising from COOK's documented violent history and REAGAN's wheelchair-bound condition, recent injury, and prior conflict with correctional staff.

A reasonable officer in these circumstances would have recognized the serious and obvious danger to REAGAN's safety and taken immediate steps to protect him from foreseeable harm.

55. Defendants DOES 1 through 20 further exhibited deliberate indifference and retaliatory motive by intentionally closing the windows and doors of the control booth, thereby preventing themselves from hearing JOSEPH REAGAN's screams for help and the pleas of other inmates who witnessed the attack. They also failed to conduct mandatory security rounds as required by the CDCR Department Operations Manual, title 15, section 1027.5, and institutional post orders. These omissions reflected a conscious and willful disregard for established CDCR safety protocols.

///

56.     Defendants DOES 1 through 20 failed to properly locate, confiscate, and report contraband weapons in violation of CDCR's Department Operations Manual, their post orders, and accepted correctional-safety standards. These failures were a direct and proximate cause of JOSEPH REAGAN's death.

57.     On information and belief, the dayroom where the attack occurred was monitored by closed-circuit television ("CCTV") providing a live video feed to the facility's control and security rooms. Defendants DOES 1 through 20 were responsible for supervising inmates in that area, including by monitoring the CCTV feed and conducting direct-view safety checks of the dayroom at regular intervals.

58.     Defendants DOES 1 through 20 failed to properly supervise the dayroom and its occupants. They failed to timely observe, detect, and intervene while inmate BRYAN COOK carried out the prolonged and violent stabbing of JOSEPH REAGAN. The attack persisted long enough to attract the attention of other inmates, who shouted for help that went unanswered.

59.     JOSEPH REAGAN sustained multiple stab wounds and experienced massive blood loss, leading to his death. Due to his wheelchair-bound condition, he was unable to defend himself or retreat, leaving him entirely dependent upon correctional staff for his safety and survival.

60.     Defendants DOES 1 through 20 were not performing their required cell and unit inspections in accordance with CDCR security protocols, including title 15, section 1027.5, and failed to promptly discover REAGAN's body following his assault. By the time they responded, REAGAN had already suffered catastrophic blood loss and could not be revived.

61.     The failure of Defendants DOES 1 through 20 to monitor and respond to events in the dayroom constituted deliberate indifference to JOSEPH REAGAN's safety. They made intentional decisions concerning the conditions of his confinement – specifically, the lack of active surveillance, timely response, and protective oversight – that placed him at substantial risk of serious harm. Reasonable and readily available measures, such as active

CCTV monitoring, timely intervention, and adherence to required safety checks, were not taken.

62.     A reasonable correctional official in these circumstances would have recognized the high degree of risk, observed the need for immediate action or intervention, and responded appropriately to prevent or stop the attack on JOSEPH REAGAN. The failure of Defendants to act demonstrates a willful and conscious disregard for his life and safety.

63.     Through their collective acts and omissions, Defendants CDCR, Warden ST. ANDRE, and DOES 1 through 20 failed to follow applicable policies, training, standards, and procedures, including those set forth in the CDCR Department Operations Manual and Title 15 of the California Code of Regulations. Their systemic and individual failures created the conditions that allowed contraband weapons to proliferate, permitted inmate violence to occur unchecked, and directly caused the preventable and brutal death of JOSEPH REAGAN.

64.     Around 6:41 p.m., it was reported that BRYAN COOK attacked JOSEPH REAGAN. He was transported to the prison's triage and treatment area for a higher level of care. At 7:17 p.m. REAGAN was pronounced deceased by medical staff.

65.     On June 11, 2025, it was reported that JOSEPH REAGAN was killed after having been attacked with an inmate-manufactured weapon.

66.     Sometime after June 10, 2025, it was reported that BRYAN COOK has been charged with felony murder related to the death of JOSEPH REAGAN.

**POLICY/CUSTOM ALLEGATIONS**

67.     At all times herein mentioned, Defendant ROBERT ST. ANDRE, in his capacity as Warden of HDSP, was a final policymaking authority for HDSP, including as it relates to the maintenance and operation of prison and detention facilities; training, supervision, and discipline of staff acting under his command; the classification, housing, and protection of inmates; the detection and eradication of contraband; and the safety and security of inmates in his custody. As Warden, Defendant ST. ANDRE received regular

reports regarding critical incidents at HDSP, including inmate deaths, assaults, contraband discoveries, and staff misconduct, and possessed the authority and responsibility to implement corrective measures in response to such incidents.

68.    Defendant ST. ANDRE has been employed by Defendant CDCR since 2018, during which time he held supervisory and policymaking capacities at various institutions. In June 2023, he was appointed Warden of HDSP and was serving in that capacity on June 10, 2025. As Warden, Defendant ST. ANDRE was responsible for reviewing all incident reports involving serious bodily injury or death, responding to Office of the Inspector General inquiries, and implementing institutional corrective action plans following critical incidents. Upon information and belief, Defendant ST. ANDRE was personally briefed on each of the inmate homicides described herein and was aware of the systemic failures in classification, housing, contraband control, and supervision that contributed to those deaths.

### Warden ST. ANDRE's Specific Knowledge of JOSEPH REAGAN

69.    Upon information and belief, Defendant ST. ANDRE knew of, or was required by CDCR policy and procedure to be informed of, the specific circumstances creating a heightened risk of serious harm to JOSEPH REAGAN. Specifically:

        a.    ***Use-of-Force Reporting:*** The prior physical altercation between REAGAN and HDSP correctional officers constituted a "use of force" incident under the CDCR Department Operations Manual. Under CDCR policy, use-of-force incidents resulting in injury requiring medical treatment trigger mandatory reporting through the institutional chain of command, culminating in review by the institution head – here, Defendant ST. ANDRE as Warden. Upon information and belief, ST. ANDRE received, reviewed, or was required to review the use-of-force report regarding REAGAN's altercation with correctional officers, and was thereby informed of REAGAN's injuries and wheelchair-bound condition.

        b.    ***Government Tort Claim Notification:*** Upon information and belief, REAGAN's government tort claim against CDCR (filed September 5,

2025, or a predecessor informal complaint) was processed through institutional administrative channels, and Defendant ST. ANDRE, as Warden, received notification of the pending claim or was informed of its existence through the Office of Legal Affairs, the Litigation Coordinator, or other institutional channels. Claims against the institution arising from staff conduct at HDSP would be routed to or through the Warden's office for factual input and institutional response.

    c. ***Combined Risk Factors Known to ST. ANDRE:*** The combination of the following factors, each of which was known or should have been known to Defendant ST. ANDRE, created a specifically identifiable risk to JOSEPH REAGAN: (i) REAGAN was wheelchair-bound due to injuries inflicted by ST. ANDRE's own correctional officers; (ii) REAGAN had filed or was in the process of filing a government tort claim against the institution; (iii) REAGAN was housed in general population with known violent offenders, including BRYAN COOK, without protective measures; (iv) inmate-manufactured weapons circulated freely within HDSP housing units; and (v) four inmates had already been killed at HDSP under ST. ANDRE's tenure as Warden, each in circumstances materially similar to those facing REAGAN. A reasonable warden, aware of these combined risk factors, would have recognized that REAGAN's situation presented a substantial and specific risk of serious harm requiring protective intervention. ST. ANDRE's failure to take any corrective action with respect to REAGAN specifically – despite the convergence of these known risk factors – constituted deliberate indifference to REAGAN's safety.

70.   Classification / Housing: Defendants CDCR and ROBERT ST. ANDRE maintained inadequate policies and customs relating to the classification and housing assignment of inmates including through inadequate consideration of information and risk

1    factors. Defendant ST. ANDRE knew, or was deliberately indifferent to the fact, that these

2    deficient policies and customs had repeatedly resulted in preventable inmate deaths at

3    HDSP. In the months leading up to the death of JOSEPH REAGAN, the following

4    homicides occurred at HDSP under Defendant ST. ANDRE's supervision as Warden, each

5    involving circumstances materially similar to those that led to REAGAN's death:

6            a.   On May 3, 2024, 49-year-old Scott Cook was housed in HDSP and was

7                 attacked by John Patch and Zachary Harris using inmate-manufactured

8                 weapons. Cook was taken to the triage and treatment area where he was

9                 pronounced deceased. https://www.cdcr.ca.gov/news/2024/05/06/high-

10               desert-state-prison-officials-investigating-the-death-of-an-incarcerated-

11               person-as-a-homicide-5/

12           b.   On August 21, 2024, 29-year-old Anthony Alvarez was housed in HDSP

13                and was attacked by Luis Alvarez and Vincent Martinez using inmate-

14                manufactured weapons. Alvarez was taken to the triage and treatment area

15                where he was pronounced deceased.

16                https://www.cdcr.ca.gov/news/2024/08/22/high-desert-state-prison-

17                officials-investigating-the-death-of-an-incarcerated-person-as-a-homicide-

18                6/

19           c.   On November 26, 2024, 44-year-old Juan Luinares was housed in HDSP

20                and was attacked by Zachary Barron using an inmate-manufactured

21                weapon. Luinares was taken to the triage and treatment area where he was

22                pronounced deceased. https://www.cdcr.ca.gov/news/2024/11/27/hdsp-

23                investigating-death-of-incarcerated-person-as-homicide-2/

24           d.   On April 26, 2025, a 54-year-old William Couste was housed in HDSP and

25                was attacked by Rodger Brown using an improvised weapon. Couste was

26                taken to the triage and treatment area where he was pronounced deceased.

27                https://www.cdcr.ca.gov/news/2025/04/26/high-desert-state-prison-

28

1    officials-investigating-the-death-of-an-incarcerated-person-as-a-homicide-

2    7/

3    71.    Each of the foregoing deaths occurred while Defendant ST. ANDRE served

4    as Warden of HDSP. Each involved an attack by one or more incarcerated persons using

5    inmate-manufactured weapons. Each resulted in the victim being transported to the triage

6    and treatment area where he was pronounced deceased. Upon information and belief,

7    following each incident, Defendant ST. ANDRE received detailed briefings regarding the

8    circumstances of the death, reviewed or was provided with incident reports and investigative

9    findings, and was required to submit corrective action plans to CDCR headquarters. Despite

10   this pattern of materially similar homicides occurring under his command, Defendant ST.

11   ANDRE personally failed to implement effective measures to prevent the continued

12   circulation of inmate-manufactured weapons, personally failed to ensure that vulnerable

13   inmates were properly classified and housed separately from known violent offenders, and

14   personally failed to enforce mandatory supervision and monitoring protocols. His personal

15   failure to take corrective action after repeated notice of the dangerous conditions at HDSP

16   constituted deliberate indifference to a known and obvious risk of serious harm to inmates,

17   including JOSEPH REAGAN.

18   72.    Contraband: Defendants CDCR and ROBERT ST. ANDRE were aware of

19   and permitted contraband entering and remaining within correctional facilities including by

20   way of inmates, employees, and/or contractors. Defendant ST. ANDRE personally knew

21   that inmate-manufactured weapons were regularly present within HDSP housing units and

22   that such weapons had been used in multiple fatal assaults under his tenure as Warden.

23   Despite this personal knowledge, Defendant ST. ANDRE personally failed to implement or

24   enforce policies and customs requiring that inmates, employees, and contractors be

25   thoroughly searched prior to entering correctional facilities, and personally failed to ensure

26   that housing units and common areas were regularly inspected for contraband. As a result,

27   contraband, including deadly weapons, frequently entered and circulated within HDSP

28   without detection or confiscation. For example:

FIRST AMENDED COMPLAINT and DEMAND FOR TRIAL BY JURY              Page 26 of 58
Case No. 2:25-cv-03429-JAM-CKD

a.  In March 2025, after a sweep of 11 high security prisons within the CDCR, including HDSP, 105 inmate-manufactured weapons, 123 cell phones, 62 needles and 189 miscellaneous items (including controlled substances, drug paraphernalia, escape paraphernalia, and other miscellaneous contraband) were discovered. https://thetoughestbeat.com/sweeps-find-weapons-drugs-dangerous-contraband-in-11-cdcr-prisons/?utm_source=chatgpt.com

b.  On June 12, 2025, HDSP was placed on a "modified program" due to increase in overdoses and contraband findings. https://www.lassennews.com/hdsp-and-other-cdcr-facilities-placed-on-modified-program?utm_source=chatgpt.com

73.  The March 2025 contraband sweep described above occurred approximately three months before JOSEPH REAGAN's death. The discovery of 105 inmate-manufactured weapons across 11 high-security prisons, including HDSP, demonstrated the pervasive and systemic nature of the contraband problem. Upon information and belief, Defendant ST. ANDRE was personally informed of the results of this sweep as they pertained to HDSP and was aware that dangerous weapons remained readily accessible to incarcerated persons within his institution. Despite this personal knowledge, Defendant ST. ANDRE personally failed to implement enhanced search protocols, additional cell inspections, or other measures sufficient to eliminate the circulation of inmate-manufactured weapons within HDSP. Approximately three months later, inmate BRYAN COOK obtained and used an inmate-manufactured weapon to kill JOSEPH REAGAN.

74.  Standards: Defendants CDCR and ROBERT ST. ANDRE's practices and customs are inconsistent with state law, applicable industry standards, and their own policies and procedures including:

a.  California Code of Regulations, title 15, section 1027 (Number of Personnel), section 1027.5 (Safety Checks), section 1050 (Classification Plan), and section 1053 (Administrative Separation).

b.  California Commission on Peace Officer Standards and Training

("POST") Learning Domain 31 (Custody), Learning Domain 62 (Case

Management and Sources of Information).

Corrections Policy 209 (Incarcerated Person Records),

Corrections Policy 224 (Staffing Plan),

Corrections Policy 500 (Population Management),

Corrections Policy 504 (Safety Checks),

Corrections Policy 508 (Inmate Classification),

Corrections Policy 602 (Supervision of Incarcerated Persons),

Corrections Policy 1100 (Space and Environmental Requirements),

Corrections Policy 1102 (Control Center),

Corrections Policy 1103 (Crowding).

75.    Defendants CDCR and ROBERT ST. ANDRE did not meaningfully discipline, re-train, correct, or otherwise penalize correctional personnel involved in critical incidents where preventable injuries or deaths were sustained by inmates, including those incidents described above. Upon information and belief, no correctional officer at HDSP was terminated, demoted, or formally disciplined as a result of the four inmate homicides that occurred at HDSP between May 2024 and April 2025. Defendants CDCR and ROBERT ST. ANDRE's routine failure to hold correctional personnel accountable communicated to subordinate staff that failures in supervision, monitoring, and contraband control would be tolerated, thereby creating, facilitating, and encouraging an environment of deliberate indifference to inmate safety.

76.    Defendants CDCR and ROBERT ST. ANDRE were or should have been on notice regarding the need to discontinue, modify, or implement new and different versions of the deficient policies or customs because the inadequacies and deficiencies were so obvious and likely to result in the violation of rights of persons, including the death of JOSEPH REAGAN.

///

77.     Defendants CDCR and ROBERT ST. ANDRE's inadequate policies, customs, training, supervision, and control of personnel, correctional facilities, and inmates under their care was a moving force behind and contributed to the injuries and death of JOSEPH REAGAN. See *Flores v. County of Los Angeles*, 758 F.3d 1154, 1159 (9th Cir. 2014) (supervisory liability attaches where supervisor "was deliberately indifferent to the need to train subordinates, and the lack of training actually caused the constitutional harm").

### FIRST CAUSE OF ACTION

**Deliberate Indifference (Pre-Attack)**

**(U.S. Const. Amend. VIII; 42 U.S.C. § 1983)**

**Against Defendants ST. ANDRE and DOES 1 through 20 in Their Individual Capacities Only**

78.     Plaintiff THE ESTATE OF JOSEPH REAGAN (pursuant to Cal. Code Civ. Proc., § 377.30) asserts this Claim against Defendants ROBERT ST. ANDRE and DOES 1 through 20 in their individual capacities only. Pursuant to the Eleventh Amendment and *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989), CDCR is not named as a defendant on this federal constitutional claim.

79.     Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

80.     ***Individual Liability:*** Plaintiff, the Estate of JOSEPH REAGAN, by and through its duly authorized Successor-in-Interest, brings this claim pursuant to section 1983 of title 42 of the United States Code for violations of JOSEPH REAGAN's rights under the Eighth Amendment to the United States Constitution.

a.     ***Objective Component:*** JOSEPH REAGAN faced a substantial risk of serious harm while housed at HDSP. He was confined to a wheelchair following injuries sustained in a prior altercation with correctional officers, rendering him physically incapable of self-defense or flight. He was housed in a unit with known violent offenders, including BRYAN COOK, who was serving a life sentence for second-degree murder. Inmate-manufactured weapons circulated freely within the housing unit due to inadequate search

and contraband-control measures. These conditions, individually and collectively, posed an objectively serious risk to REAGAN's safety.

b. **Subjective Component:** Defendants DOES 1 through 20, acting under color of state law and within the course and scope of their employment with the CDCR, knew of the substantial risk of serious harm facing JOSEPH REAGAN and disregarded that risk. Defendants were aware of REAGAN's wheelchair-bound condition, which was open and obvious to any officer who observed him. Defendants knew or should have known of BRYAN COOK's documented history of violence. Defendants knew or should have known of the presence of contraband weapons within the housing unit based on prior incidents, institutional alerts, and the results of recent contraband sweeps. Defendants knew of REAGAN's prior altercation with HDSP staff and his pending government claim against the CDCR. Despite this knowledge, Defendants failed to take reasonable measures to abate the risk, including but not limited to: the inadequate classification and housing of REAGAN; the failure to separate him from known violent inmates such as COOK; the failure to conduct adequate searches for contraband; and the failure to provide protective custody or enhanced supervision commensurate with his vulnerability. Defendant's conduct constituted deliberate indifference to REAGAN's safety in violation of the Eighth Amendment. *Farmer v. Brennan*, 511 U.S. at 837.

81. **Supervisory Liability:** Defendant Warden ROBERT ST. ANDRE, acting under color of state law and in his supervisory capacity at HDSP, is liable under section 1983 of title 42 of the United States Code for violations of JOSEPH REAGAN's rights under the Eighth Amendment to the United States Constitution. ST. ANDRE's liability is not premised on respondeat superior but on his own personal acts and omissions as Warden that were causally connected to the constitutional violation. A supervisor may be held liable under section 1983 where there is "a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation." *Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011) (quoting *Hansen v. Black*, 885 F.2d 642, 646 (9th Cir. 1989)). "[A] plaintiff may state a claim against a supervisor for deliberate indifference based upon the supervisor's

knowledge of and acquiescence in unconstitutional conduct by his or her subordinates." *Id.*, at 1207. Supervisors can be held liable for: "(1) their own culpable action or inaction in the training, supervision, or control of subordinates; (2) their acquiescence in the constitutional deprivation of which a complaint is made; or (3) for conduct that showed a reckless or callous indifference to the rights of others." Starr, 652 F.3d at 1207 (quoting Hansen, 885 F.2d at 646); see also *Lemire v. Cal. Dep't of Corr. & Rehab.*, 726 F.3d 1062, 1074–75 (9th Cir. 2013) (applying the same three-part supervisory liability test).

      a.  ***Objective Component:*** For the reasons set forth above and in the Policy/Custom Allegations, inmates at HDSP, including JOSEPH REAGAN, faced a substantial risk of serious harm arising from the pervasive presence of contraband weapons, inadequate classification and housing practices, and deficient supervision and monitoring of housing units and common areas.

      b.  ***Subjective Component:*** Defendant ST. ANDRE knew of the substantial risk of serious harm to inmates at HDSP, including specifically to JOSEPH REAGAN, and disregarded that risk. His knowledge is established by, among other things: (a) his receipt of incident reports and briefings regarding four inmate homicides at HDSP between May 2024 and April 2025, each involving attacks with inmate-manufactured weapons; (b) his knowledge of the results of the March 2025 contraband sweep, which revealed the widespread presence of weapons and other contraband within CDCR high-security facilities, including HDSP; (c) his awareness of the placement of HDSP on modified program status due to contraband and overdose concerns; (d) his knowledge, as Warden, of deficiencies in staff training, supervision, and accountability related to inmate safety; (e) his receipt or required receipt of the use-of-force report regarding REAGAN's altercation with correctional officers, which informed him of REAGAN's wheelchair-bound condition; and (f) his receipt or required receipt of notification regarding REAGAN's government tort claim against the institution. Despite actual knowledge of these conditions, and despite actual or constructive knowledge of the specific risk to REAGAN personally, Defendant ST. ANDRE personally failed to implement adequate corrective measures, personally failed to

enforce existing policies, and personally failed to discipline or retrain staff involved in prior critical incidents. His deliberate indifference to the known and substantial risk of harm at HDSP was a moving force behind the violations of JOSEPH REAGAN's constitutional rights. See Starr, 652 F.3d at 1207–08 (holding that a sheriff's knowledge of unconstitutional conditions in the jail, coupled with inaction, amounted to acquiescence sufficient to state a claim); *Flores v. County of Los Angeles*, 758 F.3d 1154, 1159 (9th Cir. 2014) (supervisor must have "disregarded the known or obvious consequences that a particular omission in [his] training program would cause … employees to violate citizens' constitutional rights"); *Lemire v. Cal. Dep't of Corr. & Rehab.*, 726 F.3d 1062, 1074–75 (9th Cir. 2013) (sustaining supervisory liability claim based on warden's knowledge of systemic problems and failure to correct them).

82.    The risk of serious harm to JOSEPH REAGAN was so obvious that Defendants must have known of it. A reasonable correctional officer or supervisor, aware that a wheelchair-bound inmate who had filed a grievance and/or claim against the institution was housed in a general population unit with documented violent offenders and where inmate-manufactured weapons were known to circulate, would inevitably conclude that such an inmate faced a substantial risk of serious harm. To the extent any Defendant claims ignorance of the risk, such ignorance itself constitutes deliberate indifference, as the risk was longstanding, pervasive, and well-documented within the institution. *Farmer*, 511 U.S. at 842.

83.    Defendants ST. ANDRE and DOES 1 through 20, acting under color of state law, intentionally and/or with reckless disregard for JOSEPH REAGAN's safety, took and failed to take actions in response to his prior physical altercation with HDSP officers. Their conduct was motivated by hostility toward REAGAN arising from that incident and demonstrated reckless or callous indifference to his constitutional rights. Such actions and omissions were wanton, oppressive, and in conscious disregard of his federally protected rights.

///

84.    As a direct and proximate result of the actions and omissions of Defendants ST. ANDRE and DOES 1 through 20, JOSEPH REAGAN suffered conscious pain and suffering prior to his death. Accordingly, Plaintiff THE ESTATE OF JOSEPH REAGAN is entitled to recover compensatory (survival) and nominal damages against Defendants ST. ANDRE and DOES 1 through 20, and punitive damages against each such Defendant whose conduct was malicious, oppressive, or in reckless disregard of REAGAN's rights.

85.    WHEREFORE, Plaintiff THE ESTATE OF JOSEPH REAGAN prays for relief as set forth below.

86.    The constitutional right of an incarcerated person to be protected from violence at the hands of other inmates when prison officials are aware of a substantial risk of serious harm has been clearly established since *Farmer v. Brennan* (1994) 511 U.S. 825, 833–34. No reasonable correctional officer or supervisor could have believed that it was constitutionally permissible to house a wheelchair-bound inmate – who had recently been injured by correctional staff and who had filed a grievance and government claim against the institution – in a general population unit with a documented violent offender serving a life sentence for murder, in a facility where inmate-manufactured weapons circulated freely and where four inmates had been killed in materially similar circumstances within the preceding thirteen months, without any protective measures whatsoever. Defendants are not entitled to qualified immunity because the unlawfulness of their conduct was apparent in light of pre-existing law, and because no objectively reasonable officer in their position could have concluded that their acts and omissions were consistent with the Eighth Amendment. See Farmer, 511 U.S. at 842 (a prison official may be held liable if "the official knew of a substantial risk from the very fact that the risk was obvious"); *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011) (denying qualified immunity where plaintiff alleged that sheriff was on notice of inmate deaths and systematic problems yet failed to act); *Lemire v. Cal. Dep't of Corr. & Rehab.*, 726 F.3d 1062, 1075 (9th Cir. 2013) (declining qualified immunity where prison officials had knowledge of dangerous conditions).

///

## SECOND CAUSE OF ACTION

### Unwarranted Interference with Familial Association

### (U.S. Const. Amend. XIV; 42 U.S.C. § 1983)

### Against Defendants ST. ANDRE and DOES 1 through 20 in Their Individual Capacities Only

87.   Plaintiff THE ESTATE OF JOSEPH REAGAN (pursuant to Cal. Code Civ. Proc., § 377.30) asserts this claim against Defendants ROBERT ST. ANDRE and DOES 1 through 20 in their individual capacities only. Pursuant to the Eleventh Amendment, CDCR is not named as a defendant on this federal constitutional claim.

88.   Plaintiff CHELSEA AUGUST, the adult daughter of JOSEPH REAGAN, brings this claim under section 1983 of title 42 of the United States Code for violation of her Fourteenth Amendment substantive due process right to the companionship, society, and familial relationship of her father.

89.   Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

90.   Plaintiff CHELSEA AUGUST and her father JOSEPH REAGAN shared a close, loving, and enduring parent–child relationship characterized by frequent communication, mutual emotional support, and deep familial affection.

91.   Defendants' conduct shocks the conscience. In the custodial context, where the State exercises total control over the conditions of an inmate's confinement and where the inmate and his family have no alternative means of ensuring the inmate's safety, deliberate indifference to a known and substantial risk of death satisfies the "shocks the conscience" standard applicable to substantive due process claims. Defendants' conduct exceeded even deliberate indifference: their retaliatory motive – punishing REAGAN for his prior altercation with HDSP officers and his pending grievance and/or government claim – demonstrates a purpose to harm REAGAN unrelated to any legitimate penological objective. Defendants knew or should have known that REAGAN had a surviving daughter and family members who depended on their continued relationship with him. By deliberately

creating and maintaining conditions that foreseeably resulted in REAGAN's death,

Defendants acted with the purpose to harm, or with deliberate indifference amounting to a

purpose to harm, not only REAGAN but also his familial relationships, including Plaintiff

CHELSEA AUGUST's constitutionally protected liberty interest in the companionship and

society of her father.

92.    ***Supervisory / Individual Liability:*** Defendants Warden ROBERT ST.

ANDRE and DOES 1 through 20, acting under color of state law and within the scope of

their employment at HDSP, deprived Plaintiff of her constitutionally protected familial

relationship by engaging in conduct that resulted in the unlawful and preventable death of

JOSEPH REAGAN. ST. ANDRE's liability is premised on his own culpable action and

inaction in the training, supervision, and control of subordinates, and his acquiescence in the

constitutional deprivation, as set forth in the Policy/Custom Allegations. See *Starr v. Baca*,

652 F.3d 1202, 1207–08 (9th Cir. 2011); *Hansen v. Black*, 885 F.2d 642, 646 (9th Cir. 1989).

93.    Defendants ST. ANDRE and DOES 1 through 20 acted with deliberate

indifference to a known and substantial risk of serious harm to JOSEPH REAGAN, or, in

the alternative, with a purpose to harm unrelated to any legitimate penological objective.

Their actions and omissions, including: 1. the failure to protect REAGAN from foreseeable

violence by inmate COOK, 2. the failure to respond to his pleas for help, and 3. retaliatory

inaction following his prior altercation with HDSP staff, shock the conscience and constitute

an unwarranted interference with Plaintiff's liberty interest in the companionship and society

of her father.

94.    Defendants' conduct was wanton, oppressive, and in reckless or callous

disregard of the constitutional rights of both JOSEPH REAGAN and CHELSEA

AUGUST.

95.    As a direct and proximate result of Defendants' conduct, Plaintiff CHELSEA

AUGUST has suffered the permanent loss of companionship, comfort, society, guidance,

and emotional support of her father, causing severe emotional distress and other

compensable injuries.

96.     Accordingly, Plaintiff CHELSEA AUGUST is entitled to compensatory and nominal damages against Defendants ST. ANDRE and DOES 1 through 20, and punitive damages against those Defendants whose conduct was malicious, oppressive, or in reckless disregard of Plaintiff's constitutional rights.

97.     WHEREFORE, Plaintiff THE ESTATE OF JOSEPH REAGAN prays for relief as set forth below.

## THIRD CAUSE OF ACTION

### Failure to Summon Medical Care

### (Cal. Gov. Code, § 845.6)

98.     Plaintiff THE ESTATE OF JOSEPH REAGAN (pursuant to Cal. Code Civ. Proc., § 377.30) asserts this claim against Defendants ROBERT ST. ANDRE and DOES 1 through 20, and against Defendant CDCR on a theory of vicarious liability under Government Code section 815.2(a).

99.     Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

100.    Government Code section 845.6 creates an express statutory exception to the general prisoner-injury immunity set forth in Government Code section 844.6(a)(2). Section 845.6 imposes liability on both public employees and public entities when an employee "knows or has reason to know that a prisoner is in need of immediate medical care and he fails to take reasonable action to summon such medical care." This statutory duty is mandatory and non-discretionary. *See Lawson v. Superior Court* (2010) 180 Cal.App.4th 1372, 1383; *Castaneda v. Dep't of Corrections & Rehabilitation* (2013) 212 Cal.App.4th 1051, 1069–1070. Defendant CDCR's liability on this claim arises under this express statutory exception.

101.    ***Individual Liability:*** Defendants DOES 1 through 20, while acting within the course and scope of their employment, knew or had reason to know that JOSEPH REAGAN was in immediate need of medical care following the attack by inmate BRYAN COOK, and failed to take reasonable action to summon such medical care, in violation of Government Code section 845.6. Their omissions included, but were not limited to: 1.

Failing to promptly notify medical staff, 2. Failing to activate emergency alarms, or 3. Failing to otherwise request emergency medical assistance once they became aware (or reasonably should have become aware) of REAGAN's life-threatening injuries.

102.    ***Personal Liability of Warden ST. ANDRE:*** Defendant Warden ROBERT ST. ANDRE is personally liable on this claim not as a vicarious supervisor but for his own independent negligent acts and omissions that proximately contributed to the failure to summon medical care. ST. ANDRE personally failed to establish, implement, and enforce adequate emergency-response protocols, training, and supervision to ensure that correctional staff under his command would promptly summon medical care for injured inmates. This failure was operational and ministerial – not a discretionary policy decision – because CDCR regulations and the Department Operations Manual already mandated prompt emergency response procedures, and ST. ANDRE's personal failure was the failure to enforce those existing mandates. ST. ANDRE's personal knowledge of the deficient emergency-response practices at HDSP is established by the pattern of prior critical incidents, including the four inmate homicides described herein, each of which involved delays in summoning medical care and failures to detect and respond to violence. Despite this personal knowledge, ST. ANDRE personally failed to take corrective action.

103.    Pursuant to Government Code section 815.2(a), Defendant CDCR is vicariously liable for the negligent and wrongful acts and omissions of their employees and agents, including Warden ST. ANDRE and DOES 1 through 20, who acted within the scope of their employment when they failed to summon medical care as required by Government Code section 845.6. CDCR's liability on this claim is authorized by the express statutory exception set forth in section 845.6, which overrides the general prisoner-injury immunity of section 844.6(a)(2).

104.    As a direct and proximate result of the foregoing acts and omissions, JOSEPH REAGAN suffered severe physical pain and injury and ultimately died. Plaintiff THE ESTATE OF JOSEPH REAGAN is therefore entitled to recover compensatory (survival) damages against Defendants CDCR, ST. ANDRE, and DOES 1 through 20, and punitive

1    damages against the individual defendants whose conduct was malicious, oppressive, or in

2    reckless disregard of REAGAN's safety and medical needs.

3        105.    WHEREFORE, Plaintiff THE ESTATE OF JOSEPH REAGAN prays for

4    relief as set forth below.

## FOURTH CAUSE OF ACTION

## Tom Bane Civil Rights Act

## (Cal. Civ. Code, § 52.1)

8        106.    Plaintiff ESTATE OF JOSEPH REAGAN (pursuant to Cal. Code Civ. Proc.,

9    § 377.30) and Plaintiff CHELSEA AUGUST, his daughter, assert this claim against

10   Defendants ROBERT ST. ANDRE and DOES 1 through 20, and against Defendant CDCR

11   on a theory of vicarious liability under Government Code section 815.2(a).

12       107.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as

13   though fully set forth herein.

14       108.    Defendants ST. ANDRE and DOES 1 through 20, while acting under color

15   of law and within the scope of their employment, interfered, and attempted to interfere, by

16   threats, intimidation, and coercion, with JOSEPH REAGAN's rights to be free from cruel

17   and unusual punishment and to receive adequate protection and medical care while in state

18   custody, as secured by the Eighth Amendment to the U.S. Constitution and Article I, section

19   7(a) of the California Constitution.

20       109.    These Defendants intentionally engaged in threats, intimidation, and coercion

21   against JOSEPH REAGAN, using their custodial authority and exclusive control over the

22   housing unit to deny him the protection to which he was constitutionally entitled. Their

23   coercive conduct included but was not limited to:

24           a.   ***Physical manipulation of the control booth:*** Defendants affirmatively

25               closed the control booth windows – the primary means by which officers

26               hear and observe inmates in the housing unit – thereby physically severing

27               their connection to the dayroom and ensuring that REAGAN's screams

28

---

FIRST AMENDED COMPLAINT and DEMAND FOR TRIAL BY JURY          Page 38 of 58
Case No. 2:25-cv-03429-JAM-CKD

1    for help would not prompt intervention. This was a deliberate, physical

2    act, undertaken to facilitate the denial of protection.

3    b. **_Deliberate refusal to intervene:_** Upon becoming aware of the attack on

4    REAGAN, whether through auditory cues, surveillance feeds, or inmate

5    reports, Defendants made the conscious decision to not enter the

6    dayroom, not to deploy authorized force, and not to stop the assault. Their

7    refusal to act was not negligent hesitation; it was purposeful abstention,

8    undertaken with knowledge that REAGAN – wheelchair-bound, bleeding,

9    and entirely dependent on Defendants for his survival – had no alternative

10    means of protection.

11    c. **_Deliberate withholding of emergency response:_** Defendants refused to

12    activate personal body alarms, institutional emergency systems, or radio

13    communications that would have summoned additional officers and

14    medical personnel. These systems existed for the sole purpose of

15    responding to emergencies like the one that killed REAGAN. By

16    deliberately refusing to activate them, Defendants used their exclusive

17    control over emergency response infrastructure to ensure that no help

18    would arrive.

19    d. **_Deliberate delay of medical care:_** After the attack concluded,

20    Defendants continued to withhold access to emergency medical care,

21    delaying the summons of medical personnel while REAGAN bled from

22    multiple stab wounds. REAGAN could not summon help himself.

23    Defendants possessed the exclusive ability to do so and deliberately chose

24    not to act promptly, using their control over medical access as a final act of

25    coercion.

26    e. **_Retaliatory motive:_** The foregoing acts of coercion were undertaken in

27    retaliation for JOSEPH REAGAN's prior physical altercation with HDSP

28    correctional officers and his grievance and/or government claim against

the CDCR. Defendants' conduct communicated an unmistakable message of intimidation: inmates who challenge HDSP staff or assert grievances and/or claims against the institution will be denied the protection of the state and left to suffer the consequences.

110.    The conduct of Defendants DOES 1 through 20 constitutes "threats, intimidation, or coercion" within the meaning of California Civil Code section 52.1. The Bane Act "prohibits any person from interfering by threats, intimidation or coercion … with the exercise or enjoyment by any individual … of the rights secured by the Constitution." *Reese v. County of Sacramento*, 888 F.3d 1030, 1040 (9th Cir. 2018) (quoting Cal. Civ. Code, § 52.1(a)). In the custodial context, coercion includes the deliberate exercise of state authority to deprive an inmate of constitutional protections. See *M.H. v. County of Alameda*, 90 F.Supp.3d 889, 899 (N.D. Cal. 2013) (deliberate indifference to inmate safety needs satisfies the Bane Act's coercion requirement); *Cornell v. City & County of San Francisco*, 17 Cal.App.5th 766, 802 n.31 (2017) (same in custodial context); *Polanco v. California*, No. 21-cv-07378, 2022 U.S. Dist. LEXIS 87755, at *4 (N.D. Cal. May 16, 2022) ("a defendant who acts with deliberate indifference toward an inmate may satisfy the 'threat, intimidation, or coercion' element, as the custody context makes that violation especially coercive"). JOSEPH REAGAN was wholly dependent on Defendants for his safety; he could not leave the housing unit, could not access security or medical systems, and could not protect himself. Defendants exploited this captive dependency by deliberately withholding the protection and emergency response that only they could provide. Their affirmative acts – closing the windows, refusing to intervene, declining to summon help, delaying medical response – were not passive omissions but intentional exercises of coercive authority designed to ensure that REAGAN's constitutional rights would be violated without interference. This conduct goes beyond the underlying constitutional violation itself and constitutes independent acts of coercion sufficient to support liability under the Bane Act. See Cornell, 17 Cal.App.5th at 800–02 (holding that coercive conduct independent of the underlying violation satisfies the Bane Act).

111.    The specific intent required under the Bane Act is established by the affirmative and deliberate nature of each of the foregoing acts. Defendants DOES 1 through 20 did not merely fail to act; they undertook purposeful, physical steps to ensure that JOSEPH REAGAN would receive no protection and no medical aid. Closing the control booth windows required a deliberate physical act. Refusing to press a body alarm button – a device designed to be activated instantly in emergencies – required a conscious decision to refrain from a simple, immediate action. Choosing not to enter a dayroom where a wheelchair-bound man was being stabbed to death required the deliberate suppression of the trained emergency response that every correctional officer is expected to execute reflexively. Each of these acts was independently volitional and coercive, and each was motivated by the retaliatory animus arising from REAGAN's prior altercation with HDSP staff and his pending grievance and/or government claim against the CDCR. The retaliatory motive supplies the specific intent to interfere with REAGAN's constitutional rights through threats, intimidation, and coercion, independent of and in addition to the underlying constitutional violation itself.

112.    ***Personal Liability of Warden ST. ANDRE:*** Defendant Warden ST. ANDRE is personally liable under the Bane Act for his own independent acts and omissions that constituted threats, intimidation, and coercion against JOSEPH REAGAN within the meaning of Civil Code section 52.1. In the custodial context, deliberate indifference to an inmate's constitutional rights by a custodial official with exclusive control over the conditions of confinement constitutes coercion sufficient to support Bane Act liability. See *M.H. v. County of Alameda*, 90 F.Supp.3d 889, 899 (N.D. Cal. 2013) (holding that deliberate indifference to an inmate's safety needs satisfies the Bane Act's coercion requirement); see also *Cornell v. City & County of San Francisco*, 17 Cal.App.5th 766, 802 n.31 (2017) (recognizing that deliberate indifference in the custodial context can satisfy the threat/intimidation/coercion element); *Polanco v. California*, No. 21-cv-07378, 2022 U.S. Dist. LEXIS 87755, at *4 (N.D. Cal. May 16, 2022) ("a defendant who acts with deliberate indifference toward an inmate may satisfy the 'threat, intimidation, or coercion' element, as

the custody context makes that violation especially coercive"). ST. ANDRE's personal coercive conduct includes: (a) his personal decision to maintain housing and classification practices that he knew, based on four prior inmate homicides, would expose vulnerable inmates like REAGAN to foreseeable violence from known violent offenders – thereby using his exclusive policymaking authority over inmate housing as an instrument that foreseeably deprived REAGAN of his right to safety; (b) his personal failure to implement corrective measures following the March 2025 contraband sweep despite knowing that deadly weapons remained accessible within HDSP housing units – a deliberate exercise of his institutional authority to permit conditions he knew would result in violence; (c) his personal knowledge of and acquiescence in the retaliatory culture at HDSP, established by the pattern of critical incidents under his command and his failure to discipline any correctional officer following four inmate homicides, which communicated to subordinate staff that coercive and retaliatory conduct toward inmates would be tolerated; and (d) his personal receipt of the use-of-force report regarding REAGAN and the government tort claim notification, which gave him specific knowledge that REAGAN was a target of institutional hostility, yet he personally took no protective action. ST. ANDRE's conduct goes beyond mere supervisory inaction; it constitutes his own independent interference, through deliberate indifference rising to the level of coercion, with REAGAN's constitutionally secured rights. See *Reese v. County of Sacramento*, 888 F.3d 1030, 1040 – 43 (9th Cir. 2018) (analyzing the Bane Act's threat/intimidation/coercion requirement). Furthermore, pursuant to California Senate Bill 2 (2021), which amended Civil Code section 52.1 to eliminate qualified immunity as a defense for peace officers and custodial officers, ST. ANDRE may not assert qualified immunity as a defense to this Bane Act claim.

113.    As a direct and proximate result of Defendants' threats, intimidation, and coercion, JOSEPH REAGAN suffered extreme pain, fear, and death.

114.    As a further direct and foreseeable consequence of Defendants' threats, intimidation, and coercion directed at JOSEPH REAGAN, Plaintiff CHELSEA AUGUST also suffered the loss of her constitutionally protected familial relationship with her father.

1    The same coercive conduct that violated JOSEPH REAGAN's rights under Article I,

2    section 7(a) of the California Constitution and the Eighth Amendment also unlawfully

3    interfered with Plaintiff AUGUST's liberty interest in the companionship and society of her

4    father.

5        115.    Pursuant to Government. Code section 815.2(a), Defendant CDCR is

6    vicariously liable for the tortious acts and omissions of its employees, including Warden ST.

7    ANDRE and DOES 1 through 20, who acted within the scope of their employment.

8        116.    Pursuant to Civil Code section 52(b), Plaintiffs are entitled to compensatory

9    and treble damages, civil penalties, and reasonable attorney's fees, and punitive damages

10   against individual defendants whose conduct was malicious, oppressive, or in reckless

11   disregard of Plaintiffs' rights.

12       117.    WHEREFORE, Plaintiffs THE ESTATE OF JOSEPH REAGAN and

13   CHELSEA AUGUST pray for relief as set forth below.

## FIFTH CAUSE OF ACTION

### Intentional Infliction of Emotional Distress

### (Common Law, Cal. Civ. Code, § 3294; Cal. Gov. Code, §§ 815.2, 820)

17       118.    Plaintiff THE ESTATE OF JOSEPH REAGAN (pursuant to Cal. Code Civ.

18   Proc., § 377.30) asserts this claim against Defendants ROBERT ST. ANDRE and DOES 1

19   through 20, and against Defendant CDCR on a theory of vicarious liability under

20   Government Code section 815.2(a).

21       119.    Plaintiff realleges and incorporates by reference all preceding paragraphs as

22   though fully set forth herein.

23       120.    ***Individual Liability:*** Defendants DOES 1 through 20, while acting within

24   the course and scope of their employment with CDCR, engaged in extreme and outrageous

25   conduct intended to cause, or carried out with reckless disregard of the probability of

26   causing, severe emotional distress to JOSEPH REAGAN. Their conduct included, but was

27   not limited to:

28   ///

a. Deliberately ignoring or closing the control-booth windows to avoid hearing REAGAN's screams for help during the prolonged attack by inmate BRYAN COOK;

b. Failing to intervene or summon immediate medical care despite knowing REAGAN was being stabbed repeatedly and faced imminent death; and

c. Allowing REAGAN, who was wheelchair-bound and physically defenseless, to be placed in proximity to violent inmates known to pose serious danger.

121.    As a result of these actions and omissions, JOSEPH REAGAN experienced intense fear, anguish, and emotional torment during the assault and while awaiting medical assistance. Defendants' conduct was so extreme and outrageous as to exceed all bounds of decency tolerated in a civilized society.

122.    The conduct of Defendants DOES 1 through 20 transcended all possible bounds of decency and is utterly intolerable in a civilized community. JOSEPH REAGAN was a wheelchair-bound man in the exclusive custody and control of the State of California. He could not leave his housing unit. He could not flee from danger. He could not summon help. He was entirely and completely dependent upon Defendants for his physical safety and survival. Defendants exploited this total dependency by deliberately abandoning him to a violent, prolonged attack by an inmate armed with a deadly weapon – while REAGAN screamed for help, while other inmates called for assistance, and while the attack was visible on surveillance monitors that Defendants were charged with observing. Defendants did not merely fail to protect REAGAN; they affirmatively sealed themselves off from his pleas by closing the control booth windows, and then refused to activate the emergency systems that only they could operate. Their conduct was motivated not by negligence or inattention but by retaliatory animus toward an inmate who had the temerity to file a grievance and government claim against the institution. This was the deliberate and calculated abandonment of a helpless human being to a foreseeable and preventable death, carried out by the very persons entrusted with his protection, for the purpose of punishing him for

asserting his legal rights. No reasonable person could regard such conduct as anything other than extreme and outrageous.

123.  ***Personal Liability of Warden ST. ANDRE:*** Defendant Warden ROBERT ST. ANDRE, acting within the course and scope of his employment, is personally liable for this claim based on his own independent negligent and wrongful acts and omissions. ST. ANDRE personally failed to adequately supervise, train, and discipline subordinate staff, thereby permitting the above-described extreme and outrageous conduct. ST. ANDRE personally knew, or reasonably should have known, based on the pattern of prior inmate homicides and critical incidents at HDSP, that correctional officers under his command routinely disregarded inmate safety and failed to respond to violent incidents or medical emergencies. His personal failure to take corrective action despite this knowledge proximately caused the injuries to REAGAN. These are ST. ANDRE's own operational failures to enforce existing mandatory protocols – not discretionary policy decisions – and liability is imposed under the exception to Government Code section 820.8 for injury proximately caused by a public employee's own negligent or wrongful act or omission.

124.  Pursuant to Government Code section 815.2(a), Defendant CDCR is vicariously liable for the acts and omissions of Warden ST. ANDRE and DOES 1 through 20, who acted within the course and scope of their employment.

125.  The acts and omissions of Defendants ST. ANDRE and DOES 1 through 20 were undertaken with malice, oppression, and conscious disregard for the rights and safety of JOSEPH REAGAN, entitling Plaintiff to punitive damages against those individual defendants pursuant to Civil Code section 3294.

126.  As a direct and proximate result of Defendants' conduct, JOSEPH REAGAN suffered severe emotional distress, fear, and suffering prior to his death. Plaintiff THE ESTATE OF JOSEPH REAGAN is entitled to recover compensatory (survival) damages against Defendants CDCR, Warden ST. ANDRE, and DOES 1 through 20, and punitive damages against the individual defendants.

///

127.    WHEREFORE, Plaintiff THE ESTATE OF JOSEPH REAGAN prays for relief as set forth below.

### SIXTH CAUSE OF ACTION

### Negligence

### (Cal. Civ. Code, § 1714(a); Cal. Gov. Code, §§ 815.2, 820, 845.6)

128.    Plaintiff THE ESTATE OF JOSEPH REAGAN (pursuant to Cal. Code Civ. Proc., § 377.30) asserts this claim against Defendants ROBERT ST. ANDRE and DOES 1 through 20, and against Defendant CDCR on a theory of vicarious liability under Government Code section 815.2(a) and, as to the failure to summon medical care, under the express statutory exception of Government Code section 845.6.

129.    Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

130.    ***Individual Liability:*** Defendants DOES 1 through 20, while acting within the course and scope of their employment with CDCR, owed JOSEPH REAGAN a duty of ordinary and reasonable care to ensure his safety, protection, and provision of medical attention while in state custody. This duty arose from the special relationship between custodial officers and inmates, under which officers must take reasonable steps to protect prisoners from foreseeable harm.

131.    Defendants DOES 1 through 20 breached that duty of care by, among other negligent acts and omissions:

    a.  Improperly classifying and housing JOSEPH REAGAN in proximity to violent inmates, including BRYAN COOK, in violation of title 15, sections 1050 and 1053;

    b.  Failing to maintain adequate supervision and safety checks in the housing unit and dayroom as mandated by title 15, section 1027.5;

    c.  Allowing the circulation and possession of inmate-manufactured weapons in violation of established contraband-control protocols; and,

///

d.  Failing to promptly summon or provide emergency medical assistance once REAGAN was attacked and visibly in distress, in violation of Government Code section 845.6.

132.  As a direct and proximate result of these negligent acts and omissions, JOSEPH REAGAN suffered severe physical and emotional injuries and ultimately died.

133.  ***Personal Liability of Warden ST. ANDRE:*** Defendant Warden ROBERT ST. ANDRE, while acting within the course and scope of his employment, is personally liable for his own independent negligent acts and omissions that proximately caused REAGAN's injuries and death. ST. ANDRE's personal negligence includes his own failure to enforce and carry out existing mandatory regulations and established institutional protocols, specifically:

a.  His personal failure to enforce title 15, section 1027.5 safety-check requirements despite his personal knowledge, derived from four prior inmate homicides, that staff were not conducting required checks;

b.  His personal failure to enforce title 15, sections 1050 and 1053 classification and housing-separation requirements despite his personal knowledge that vulnerable inmates were being housed with known violent offenders;

c.  His personal failure to implement corrective action following the March 2025 contraband sweep despite being personally informed that weapons were circulating in HDSP housing units; and,

d.  His personal failure to take any corrective or protective action with respect to REAGAN specifically, despite his personal receipt or required receipt of the use-of-force report regarding REAGAN and notification of REAGAN's government tort claim.

These failures were operational and ministerial in nature – they were failures to carry out existing mandatory regulatory requirements, not discretionary policy decisions. Accordingly, ST. ANDRE's conduct is not entitled to immunity under Government Code

section 820.2. See *Johnson v. State of California* (1968) 69 Cal.2d 782, 793–794 (distinguishing immune policy decisions from non-immune operational failures); *Haggis v. City of Los Angeles* (2000) 22 Cal.4th 490, 498–499 (same). Furthermore, ST. ANDRE's liability is personal under the exception to Government Code section 820.8 for injury "proximately caused by his own negligent or wrongful act or omission."

134.    ***Vicarious Liability:*** Pursuant to Government Code section 815.2(a), Defendant CDCR is vicariously liable for the negligent acts and omissions of their employees and agents, including Warden ST. ANDRE and DOES 1 through 20, committed within the course and scope of employment.

135.    As a direct and proximate result of the negligence of Defendants ST. ANDRE and DOES 1 through 20, JOSEPH REAGAN suffered pain, suffering, and emotional distress prior to his death. Plaintiff THE ESTATE OF JOSEPH REAGAN is entitled to recover compensatory (survival) damages against Defendants CDCR, ST. ANDRE, and DOES 1 through 20, and punitive damages against the individual defendants whose conduct was malicious, oppressive, or in reckless disregard of decedent's safety.

136.    WHEREFORE, Plaintiff THE ESTATE OF JOSEPH REAGAN prays for relief as set forth below.

## SEVENTH CAUSE OF ACTION

### Wrongful Death

### (Cal. Code Civ. Proc., § 377.60; Gov. Code, §§ 815.2, 820)

137.    Plaintiff CHELSEA AUGUST, the natural daughter and lawful heir of JOSEPH REAGAN, brings this action under California Code of Civil Procedure section 377.60 against Defendants ROBERT ST. ANDRE and DOES 1 through 20, and against CDCR on a theory of vicarious liability under Government Code section 815.2(a).

138.    Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

139.    Plaintiff CHELSEA AUGUST shared a close and loving relationship with her father, JOSEPH REAGAN, regularly speaking with and visiting him prior to his death. As

his surviving child and heir, she has suffered, and continues to suffer, the loss of his love, companionship, comfort, guidance, and support.

140. **_Individual Negligence:_** Defendants DOES 1 through 20, while acting within the course and scope of their employment with CDCR, owed JOSEPH REAGAN a duty to exercise reasonable care for his safety, protection, and medical needs. These Defendants breached that duty by, among other acts and omissions:

> a. Improperly classifying and housing REAGAN in proximity to violent inmates, including BRYAN COOK;
>
> b. Failing to monitor and supervise inmates in the housing unit and dayroom;
>
> c. Allowing the circulation and possession of inmate-manufactured weapons; and,
>
> d. Failing to promptly summon or provide medical care once REAGAN was visibly injured and in need of immediate aid.

141. **_Personal Liability of Warden ST. ANDRE:_** Defendant Warden ROBERT ST. ANDRE is personally liable for his own independent negligent acts and omissions that proximately caused the death of JOSEPH REAGAN. ST. ANDRE personally failed to discharge existing mandatory regulatory requirements, including enforcement of title 15, sections 1027, 1027.5, 1050, and 1053, and Department Operations Manual provisions governing contraband control, emergency response, and use-of-force reporting. These personal failures are documented by the pattern of four prior inmate homicides under his command, his personal receipt of use-of-force and incident reports, the March 2025 contraband sweep results, and the use-of-force report and government tort claim relating to REAGAN specifically. ST. ANDRE's failures were operational and ministerial – not discretionary policy decisions – and his liability is personal under the exception to Government Code section 820.8.

142. Inmate BRYAN COOK, whose violent history was known or should have been known to correctional staff, repeatedly stabbed JOSEPH REAGAN with an inmate-

manufactured weapon, inflicting fatal injuries while correctional staff failed to intervene or respond in a timely manner.

143. **Vicarious Liability:** Pursuant to Government Code section 815.2(a), Defendant CDCR is vicariously liable for the negligent acts and omissions of Warden ST. ANDRE and DOES 1 through 20, who acted within the course and scope of their employment.

144. As a direct and proximate result of Defendants' negligence and wrongful acts, JOSEPH REAGAN suffered fatal injuries, causing Plaintiff CHELSEA AUGUST to suffer the loss of her father's love, companionship, comfort, care, assistance, moral support, and guidance.

145. Plaintiff CHELSEA AUGUST is entitled to recover compensatory damages against Defendants CDCR, ROBERT ST. ANDRE, and DOES 1 through 20, and punitive damages against the individual Defendants whose conduct was malicious, oppressive, or in reckless disregard of JOSEPH REAGAN's safety.

146. WHEREFORE, Plaintiff CHELSEA AUGUST prays for relief as set forth below.

## EIGHTH CAUSE OF ACTION

### Deliberate Indifference (Post-Attack)

### (U.S. Const. Amend. VIII; 42 U.S.C. § 1983)

### Against Defendants DOES 1 through 20 and Warden ST. ANDRE in Their

### Individual Capacities Only

147. Plaintiff THE ESTATE OF JOSEPH W. REAGAN (pursuant to Cal. Code Civ. Proc., § 377.30) asserts this claim against Defendants DOES 1 through 20 in their individual capacities, and against Defendant Warden ROBERT ST. ANDRE in his individual supervisory capacity. Pursuant to the Eleventh Amendment, CDCR is not named as a defendant on this federal constitutional claim.

148. Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

149.    At all relevant times, JOSEPH REAGAN had serious and obvious medical needs during and immediately after the June 10, 2025 assault.

a.    ***Objective Component:*** REAGAN suffered multiple stab wounds inflicted by an inmate-manufactured weapon, resulting in massive blood loss and life-threatening injuries. His medical need was objectively serious: absent immediate emergency intervention, his injuries were certain to result in death. The severity of his condition was apparent to any observer – REAGAN was visibly bleeding, incapacitated, and in acute distress.

b.    ***Subjective Component:*** Defendants DOES 1 through 20, acting under color of state law, knew of JOSEPH REAGAN's serious medical needs and were deliberately indifferent to those needs in violation of the Eighth Amendment, as made actionable by section 1983 of title 42 of the United States Code. Defendants were aware, or the circumstances were such that they must have been aware, that REAGAN had been attacked and was suffering from life-threatening injuries. Other inmates in the housing unit called for help, audibly alerting staff to the emergency. The attack was visible on closed-circuit surveillance monitors that Defendants were responsible for observing. Despite awareness of a substantial risk of serious harm and death, Defendants failed to take reasonable measures to summon or provide necessary care, including but not limited to:

    i.    Failing to promptly activate personal or institutional alarms designed to summon emergency response;

    ii.    Failing to immediately notify medical staff of a life-threatening emergency;

    iii.    Failing to timely enter the dayroom and render first aid, apply pressure to wounds, or use authorized force to stop the attack so that medical aid could be provided; and,

    iv.    Delaying the dispatch or arrival of medical personnel by failing to communicate the severity of REAGAN's injuries.

///

Defendants' failure to respond to REAGAN's obvious and serious medical needs caused him to suffer unnecessary pain and a prolonged period of conscious suffering, and was a substantial factor in his death.

150.   The objective reasonableness of REAGAN's medical needs and Defendant's subjective awareness of those needs are further established by the following circumstances: REAGAN was wheelchair-bound and entirely incapable of seeking help or rendering self-aid; the attack occurred in a dayroom under active (or required) CCTV surveillance; other inmates audibly called for assistance; and the attack was of sufficient duration that any officer conducting required safety checks or monitoring surveillance feeds would have observed it. A reasonable officer in these circumstances would have recognized the acute, life-threatening nature of REAGAN's injuries and acted promptly to summon and facilitate emergency care. Defendants' failure to do so constituted deliberate indifference to his serious medical needs.

151.   **Supervisory Liability:** Defendant Warden ROBERT ST. ANDRE, acting under color of state law in a supervisory capacity, is liable for the post-attack deliberate indifference to JOSEPH REAGAN's serious medical needs. ST. ANDRE's liability is not premised on respondeat superior but on his own personal acts and omissions as Warden. See *Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011) ("when a supervisor is found liable based on deliberate indifference, the supervisor is being held liable for his or her own culpable action or inaction"); *Hansen v. Black*, 885 F.2d 642, 646 (9th Cir. 1989) (supervisors liable for their own culpable inaction in the training, supervision, or control of subordinates).

a.   **Objective Component:** Inmates at HDSP who suffer violent assaults have serious medical needs requiring prompt emergency response.

b.   **Subjective Component:** Defendant ST. ANDRE knew of and acquiesced in the customs and practices of delayed or inadequate medical response to inmate emergencies at HDSP. Upon information and belief, prior critical incidents at HDSP, including the inmate homicides described herein, involved delays in summoning medical care and failures to promptly detect and respond to inmate-on-inmate violence. Defendant ST.

ANDRE was aware of these deficiencies through incident reports, after-action reviews, and his supervisory responsibilities, yet personally failed to implement adequate training, supervision, and accountability measures to ensure prompt emergency medical response. His deliberate indifference to the substantial risk that his subordinates would fail to summon needed care was a moving force behind the constitutional violation that caused JOSEPH REAGAN's death. See *Starr v. Baca*, 652 F.3d 1202, 1207–08 (9th Cir. 2011); *Flores v. County of Los Angeles*, 758 F.3d 1154, 1159 (9th Cir. 2014).

152.    As a direct and proximate result of the foregoing, JOSEPH REAGAN suffered conscious pain and suffering and ultimately died. Plaintiff THE ESTATE OF JOSEPH REAGAN is entitled to compensatory (survival) and nominal damages against DOES 1 through 20 and Warden ST. ANDRE, and to punitive damages against each individual defendant whose conduct was malicious, oppressive, or in reckless disregard of REAGAN's rights.

153.    WHEREFORE, Plaintiff THE ESTATE OF JOSEPH REAGAN prays for relief as set forth below.

## NINTH CAUSE OF ACTION

### Prospective Injunctive and Declaratory Relief

### (U.S. Const. Amend. VIII; 42 U.S.C. § 1983)

### Under *Ex Parte Young*, 209 U.S. 123 (1908)

154.    Plaintiffs THE ESTATE OF JOSEPH REAGAN and CHELSEA AUGUST assert this claim against Defendant Warden ROBERT ST. ANDRE in his official capacity. Pursuant to the doctrine of Ex Parte Young (1908) 209 U.S. 123, the Eleventh Amendment does not bar prospective injunctive and declaratory relief against state officials in their official capacities to prevent ongoing violations of federal law. See also *Edelman v. Jordan*, 415 U.S. 651, 664 (1974) ("a federal court, consistent with the Eleventh Amendment, may prospectively enjoin a state officer from violating federal law").

155.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as though fully set forth herein.

156.    As alleged herein, HDSP, under the supervision of Defendant ST. ANDRE, maintains policies, customs, and practices that create a substantial risk of serious harm to incarcerated persons in violation of the Eighth Amendment. These include, but are not limited to: (a) the systemic failure to detect, remove, and prevent the circulation of inmate-manufactured weapons; (b) the inadequate classification and housing of vulnerable inmates with known violent offenders; (c) the failure to conduct required safety checks and dayroom monitoring; and (d) the failure to ensure timely emergency response to inmate-on-inmate violence.

157.    These unconstitutional conditions are ongoing. The pattern of inmate homicides at HDSP – four in the thirteen months preceding JOSEPH REAGAN's death, and REAGAN's own death thereafter – demonstrates that the risk of harm persists and that Defendant's existing measures are constitutionally inadequate.

158.    Plaintiffs have standing to seek prospective injunctive and declaratory relief. The unconstitutional policies, customs, and practices at HDSP are not limited to JOSEPH REAGAN; they affect all incarcerated persons housed at HDSP who share the characteristics that made REAGAN vulnerable, including but not limited to persons with physical disabilities or mobility limitations, persons who have filed administrative grievances or government claims against the institution, and persons housed with known violent offenders without adequate classification and separation measures. Upon information and belief, such persons are currently housed at HDSP and continue to face the same substantial risk of serious harm that resulted in REAGAN's death.

159.    The ongoing nature of the unconstitutional conditions is confirmed by the fact that HDSP was placed on "modified program" status on June 12, 2025 – two days after REAGAN's death – due to increases in overdoses and contraband findings, demonstrating that the dangerous conditions persisted even after the attack. The pattern of five inmate homicides at HDSP within approximately fourteen months, each involving inmate-manufactured weapons and failures of classification, supervision, and contraband control, establishes that the risk is systemic and recurring rather than isolated, and that Defendants'

existing measures are constitutionally inadequate to protect the incarcerated population.
Absent injunctive relief from this Court, incarcerated persons at HDSP will continue to face
a substantial risk of serious harm from the same unconstitutional conditions that caused
JOSEPH REAGAN's death.

160.    Plaintiffs seek an order from this Court requiring Defendant ST. ANDRE, in
his official capacity as Warden of HDSP, and his successors, to implement prospective
remedial measures to bring HDSP into compliance with the Eighth Amendment, including
but not limited to:

a.  Implementation of enhanced and regular contraband-detection protocols,
including cell searches, housing unit inspections, and screening of all
persons entering correctional facilities;

b.  Implementation of adequate inmate classification and housing-separation
policies to ensure that vulnerable inmates, including those who are
physically disabled or who have filed grievances, are not housed with
known violent offenders without appropriate protective measures;

c.  Implementation of adequate staffing, training, supervision, and
accountability measures to ensure that mandatory safety checks, dayroom
monitoring, and CCTV surveillance are performed consistently and
effectively; and,

d.  Implementation of adequate emergency-response protocols to ensure that
correctional staff promptly detect and respond to inmate-on-inmate
violence and summon medical care without delay.

161.    Plaintiffs further seek a declaration from this Court that Defendant's policies,
customs, and practices, as described herein, violate the Eighth Amendment's prohibition
against cruel and unusual punishment.

162.    WHEREFORE, Plaintiffs pray for prospective injunctive and declaratory
relief as set forth below.

///

# **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiffs THE ESTATE OF JOSEPH REAGAN and CHELSEA AUGUST seek Judgment as follows:

1. For an award of compensatory, general, special, and nominal damages, including survival damages and wrongful death damages, against Defendants ROBERT ST. ANDRE and DOES 1 through 20 under federal and state law, and against Defendant CDCR under state law only, according to proof at trial;

2. For an award of exemplary/punitive damages against Defendants ROBERT ST. ANDRE and DOES 1 through 20, in an amount sufficient to deter and to make an example of them, because their actions and/or inactions, as alleged, were motivated by evil motive or intent, involved reckless or callous indifference to constitutionally and statutorily protected rights, or were wantonly or oppressively done, and/or constituted oppression and/or malice resulting in great harm (except that no punitive damages are sought against Defendant CDCR pursuant to California Government Code section 818);

3. For funeral and/or burial expenses;

4. For an award of actual damages, treble damages, punitive damages, civil penalties, and any other available relief against Defendants CDCR, ROBERT ST. ANDRE and DOES 1 through 20, pursuant to California Civil Code sections 52, 52.1, and any other statute as may be applicable (except that no punitive damages are sought against Defendant CDCR);

5. For interest as allowed by law;

6. For an award of attorneys' fees and costs, pursuant to section 1988 of title 42 of the United States Code, California Civil Code section 52.1, California Code of Civil Procedure section 1021.5, and any other statute as may be applicable;

7. For prospective injunctive and declaratory relief against Defendant Warden ROBERT ST. ANDRE in his official capacity, pursuant to the doctrine of *Ex*

1    *Parte Young*, 209 U.S. 123 (1908), as set forth in the Ninth Cause of Action;

2    and,

3    8.    For an award of any other further relief as the Court deems fair, just, and

4    equitable.

5

6    Respectfully submitted,

7

8    Dated: March 2, 2026                    **HARRISON | KRISTOPHER, LLP**

9

10                    By: _____

11                        Bryan J. Harrison, Esq.,
                         Attorney for Plaintiffs, THE ESTATE OF
12                        JOSEPH REAGAN, by and through Chelsea
                         August, Successor-in-Interest to Decedent
13                        Joseph Reagan; and CHELSEA AUGUST as
                         an individual

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

<u>**DEMAND FOR TRIAL BY JURY**</u>

2   Plaintiffs THE ESTATE OF JOSEPH REAGAN, and CHELSEA AUGUST hereby

3 demand trial of this matter by jury.

4

5   Respectfully submitted,

6

7 Dated: March 2, 2026      **HARRISON | KRISTOPHER, LLP**

8

9          By: _____

10           Bryan J. Harrison, Esq.,
             Attorney for Plaintiffs, THE ESTATE OF

11           JOSEPH REAGAN, by and through Chelsea
             August, Successor-in-Interest to Decedent

12           Joseph Reagan; and CHELSEA AUGUST as
             an individual

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**EXHIBIT 1**

1  BRYAN J. HARRISON, ESQ. (SBN 277312)
   *Bryan@h-klaw.com*
2  EDI P. KRISTOPHER, ESQ.  (SBN 284833)
   *Edi@h-klaw.com*
3  **HARRISON |KRISTOPHER, LLP**
   301 E. Colorado Blvd., Ste. 323
4  Pasadena, California 91101
   Telephone: (866) 529-6155
5  Facsimile: (866) 565-6206

6  HOSSEIN KHATAMI, ESQ. (SBN 278350)
   *Hoss@hosslaw.com*
7  **HOSS LAW, P.C.**
   2140 Professional Dr., Ste. 150
8  Roseville, California 95661
   Telephone: (916) 788-4445
9  Facsimile: (916) 788-4447

10
   Attorneys for Plaintiffs
11

12              UNITED STATES DISTRICT COURT

13              EASTERN DISTRICT OF CALIFORNIA

14                 SACRAMENTO DIVISION

15

16  THE ESTATE OF JOSEPH REAGAN, *by*          Case No.:
17  *and through Chelsea August, Successor in Interest to*
    *Decedent Joseph Reagan;* CHELSEA AUGUST   **DECLARATION OF CHELSEY**
18  *as an individual,*                        **AUGUST, Re: SUCCESSOR IN**
19                                             **INTEREST AND HEIRSHIP (Cal.**
              Plaintiffs,                      **Code Civ. Proc. § 377.32)**
20
21              vs.

22  CALIFORNIA DEPARTMENT OF
    CORRECTIONS AND
23  REHABILITATION (CDCR), an agency of
    the State of California; HIGH DESERT
24  STATE PRISON, a CDCR state prison;
    ROBERT ST. ANDRE, Warden of High
25  Desert State Prison; BRYAN COOK and
    DOES 1 to 20, individually, jointly and
26  severally,

27              Defendants.

28

---

**DECLARATION OF CHELSEY AUGUST Re: SUCCESSOR IN INTEREST AND HEIRSHIP**

1

Docusign Envelope ID: F1F9E74A-2FFA-46BE-B9ED-BFE32A91DEFF

1    I, CHELSEY AUGUST, declare as follows:

2    1.    My name is Chelsey August. I am over 18 years of age and competent to make

3    this declaration. I submit this declaration pursuant to California Code of Civil Procedure §

4    377.32 to establish my standing as the successor in interest and biological heir of Joseph W.

5    Reagan, deceased.

6    2.    Decedent's Information:

7        a.    Name: Joseph W. Reagan

8        b.    Death of Death: June 10, 2025

9        c.    Place of Death: High Desert State Prison, Susanville, California.

10    3.    Relationship to Decedent: I am the biological daughter of Joseph W. Reagan.

11    Attached hereto as **Exhibit A** is a true and correct copy of my certified birth certificate,

12    which lists Joseph W. Reagan as my father. I am the sole biological child of the decedent.

13    4.    Decedent's Marital Status: To the best of my knowledge and belief, the

14    decedent was unmarried at the time of his death.

15    5.    No Pending Probate Proceding: To the best of my knowledge and belief, after

16    diligent inquiry, no proceeding is now pending in California for the administration of the

17    estate of Joseph W. Reagan, and I am not aware of any such proceeding having been

18    commenced.

19    6.    Intestate Estate: To the best of my knowledge and belief, the decedent died

20    intestate, having left no valid will or testamentary instrument.

21    7.    Other Heirs: To the best of my knowledge and belief, after diligent inquiry, I

22    am the sole heir at law of Joseph W. Reagan under California's laws of intestate succession.

23    8.    Successor-in-Interest Status: I am the successor in interest to Joseph W.

24    Reagan, as that term is defined in Cal. Code Civ. Proc. § 377.11, and I succeed to his interest

25    in any and all causes of action that survived his death.

26    9.    Purpose of Declaration: This declaration is made so that I may properly

27    prosecute, as decedent's successor in interest, those causes of action that survived his death

28

**DECLARATION OF CHELSEY AUGUST Re: SUCCESSOR IN INTEREST AND HEIRSHIP**    2

1    under Cal. Code Civ. Proc. § 377.30, and to bring, in my individual capacity, claims for

2    wrongful death pursuant to Cal. Code Civ. Proc. § 377.60.

3        10.    Superior Right: No other person has a superior right to commence this action

4    or to act as the successor in interest of the decedent. As the sole biological child and heir of

5    the decedent, I have the sole and exclusive right to prosecute survival actions on behalf of

6    the decedent's estate and to bring wrongful death claims arising from his death.

7        11.    Supporting Documentation: The following documents are attached hereto and

8    incorporated by reference:

9            a.   **Exhibit A**: Copy of my Birth Certificate establishing my biological

10               relationship to decedent.

11           b.   **Exhibit B**: Copy of Death Certificate of Joseph W. Reagan.

12       I declare under penalty of perjury under the laws of the State of California that the

13   foregoing is true and correct.

14   Executed on ___11/3___, 2025, at ___3:56_____ [City, State].

15

16

17   CHELSEY AUGUST
     Declarant

18

19

20

21

22

23

24

25

26

27

28

---

**DECLARATION OF CHELSEY AUGUST Re: SUCCESSOR IN INTEREST AND HEIRSHIP**    3

**EXHIBIT A**

# COUNTY of MERCED
### MERCED, CALIFORNIA

**CERTIFICATE OF LIVE BIRTH**
**STATE OF CALIFORNIA**
USE BLACK INK ONLY

1199924002080

| | STATE FILE NUMBER | | | LOCAL REGISTRATION DISTRICT AND CERTIFICATE NUMBER |
|---|---|---|---|---|

| | 1A NAME OF CHILD — FIRST (GIVEN) | 1B. MIDDLE | | 1C. LAST (FAMILY) |
|---|---|---|---|---|
| **THIS CHILD** | CHELSEY | ANN | | AUGUST |

| | 2. SEX | 3A. THIS BIRTH, SINGLE, TWIN, ETC | 3B IF MULTIPLE, THIS CHILD 1ST, 2ND, ETC | 4A. DATE OF BIRTH — MM/DD/CCYY | 4B HOUR — (24 HOUR CLOCK TIME) |
|---|---|---|---|---|---|
| | FEMALE | SINGLE | — | ▮▮▮▮ | 1520 |

| **PLACE OF BIRTH** | 5A PLACE OF BIRTH — NAME OF HOSPITAL OR FACILITY | | 5B. STREET ADDRESS — STREET, NUMBER, OR LOCATION | |
|---|---|---|---|---|
| | MERCY HOSPITAL | | 2740 M STREET | |
| | 5C CITY | 5D. COUNTY | | 5E PLANNED PLACE OF BIRTH |
| | MERCED | MERCED | | HOSPITAL |

| **FATHER OF CHILD** | 6A. NAME OF FATHER — FIRST (GIVEN) | 6B MIDDLE | 6C LAST (FAMILY) | 7 STATE OF BIRTH | 8 DATE OF BIRTH |
|---|---|---|---|---|---|
| | JOSEPH | WESLEY | REAGAN | CA | 06/26/1980 |

| **MOTHER OF CHILD** | 8A NAME OF MOTHER — FIRST (GIVEN) | 8B MIDDLE | 9C LAST (MAIDEN) | 10 STATE OF BIRTH | 11. DATE OF BIRTH |
|---|---|---|---|---|---|
| | DIANA | RENE | AUGUST | CA | 09/25/1982 |

| **INFORMANT CERTIFICATION** | I CERTIFY THAT I HAVE REVIEWED THE STATED INFORMATION AND THAT IT IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE | 12A PARENT OR OTHER INFORMANT — SIGNATURE *Diana august* | 12B RELATIONSHIP TO CHILD Mother | 12C. DATE SIGNED 09/18/1999 |
|---|---|---|---|---|

| **CERTIFICATION OF BIRTH** | I CERTIFY THAT THE CHILD WAS BORN ALIVE AT THE DATE, HOUR AND PLACE STATED | 13A ATTENDANT OR CERTIFIER — SIGNATURE — DEGREE OR TITLE *Barbara R. Eddy, ART.CCS* | 13B. LICENSE NUMBER G067412 | 13C. DATE SIGNED 09/20/1999 |
|---|---|---|---|---|
| | 13D TYPED NAME, TITLE AND MAILING ADDRESS OF ATTENDANT LINDA OTTEMOELER, MD, 737 W CHILDS AVE, MERCED | | 14 TYPED NAME AND TITLE OF CERTIFIER IF OTHER THAN ATTENDANT BARBARA R EDDY, ART, CCS | |

| **LOCAL REGISTRAR** | 15A DATE OF DEATH | 15B. STATE FILE NO (STATE USE ONLY) | 16 LOCAL REGISTRAR — SIGNATURE | 17 DATE ACCEPTED FOR REGISTRATION 09/21/1999 |
|---|---|---|---|---|


*000226899*

**CERTIFIED COPY OF VITAL RECORDS**
STATE OF CALIFORNIA, COUNTY OF MERCED-RECORDER

This is a true and exact reproduction of the document officially registered and
placed on file in the office of the MERCED COUNTY RECORDER.

DATE ISSUED: **JUL 09 2009**



KENT B. CHRISTENSEN
MERCED COUNTY RECORDER

This copy is not valid unless prepared on an engraved border, displaying the date, seal and signature of the Recorder.

PENCO (8) CSR

**EXHIBIT B**

# STATE OF CALIFORNIA
## CERTIFICATION OF VITAL RECORD

# COUNTY OF LASSEN
### SUSANVILLE, CALIFORNIA 96130

**CERTIFICATE OF DEATH**

STATE FILE NUMBER — 3202518000062

LOCAL REGISTRATION NUMBER

| | | |
|---|---|---|
| 1. NAME OF DECEDENT—FIRST (Given) JOSEPH | 2. MIDDLE WESLEY | 3. LAST (Family) REAGAN |

AKA, ALSO KNOWN AS – Include full AKA (FIRST, MIDDLE, LAST)

| 4. DATE OF BIRTH mm/dd/ccyy 1951 | 6. AGE Yrs. 44 | 8. SEX M |
|---|---|---|

| 7. BIRTH STATE/FOREIGN COUNTRY CA | 10. SOCIAL SECURITY NUMBER 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 | 11. EVER IN U.S. ARMED FORCES? [X] NO | 12. MARITAL STATUS NEVER MARRIED | 13. DATE OF DEATH mm/dd/ccyy 08/10/2025 | 9. HOUR 24 Hour |
|---|---|---|---|---|---|

| 13. EDUCATION HS GRADUATE | 14/15. WAS DECEDENT HISPANIC/LATINO/SPANISH? [X] NO | 16. DECEDENT'S RACE WHITE |
|---|---|---|

| 17. USUAL OCCUPATION INMATE | 18. KIND OF BUSINESS OR INDUSTRY PRISONER | 19. YEARS IN OCCUPATION 15 |
|---|---|---|

**USUAL RESIDENCE**

| 20. DECEDENT'S RESIDENCE 475-750 RICE CANYON RD. | | |
|---|---|---|
| 21. CITY SUSANVILLE | 22. COUNTY/PROVINCE LASSEN | 23. ZIP CODE 96130 |
| 24. YEARS IN COUNTY 0 | 25. STATE/FOREIGN COUNTRY CA | |

**INFORMANT**

| 26. INFORMANT'S NAME, RELATIONSHIP AMANDA BALLINGER, SISTER | 27. INFORMANT'S MAILING ADDRESS 1717 OLIVER ST., DOS PALOS, CA 95464 |
|---|---|

**SPOUSE AND PARENT INFORMATION**

| 28. NAME OF SURVIVING SPOUSE/SDP—FIRST | 29. MIDDLE | 30. LAST (BIRTH NAME) |
|---|---|---|
| 31. NAME OF PARENT—FIRST WESLEY | 32. MIDDLE GORDON | 33. LAST (BIRTH NAME) REAGAN | 34. BIRTH STATE CA |
| 35. NAME OF PARENT—FIRST SHELLEY | 36. MIDDLE MARIE | 37. LAST (BIRTH NAME) DAVIS | 38. BIRTH STATE CA |

**FUNERAL DIRECTOR / LOCAL REGISTRAR**

| 39. DISPOSITION DATE mm/dd/ccyy 06/17/2025 | 40. PLACE OF FINAL DISPOSITION RES AMANDA BALLINGER 1717 OLIVER ST., DOS PALOS, CA 93620 | 1 of 2 |
|---|---|---|
| 41. TYPE OF DISPOSITION(S) CREMATE/RESIDENCE | 42. SIGNATURE OF EMBALMER ▶ NOT EMBALMED | 43. LICENSE NUMBER |
| 44. NAME OF FUNERAL ESTABLISHMENT FINK FUNERAL HOME | 45. LICENSE NUMBER FD707 | 46. SIGNATURE OF LOCAL REGISTRAR ▶ JULIE M. BUSTAMANTE | 47. DATE mm/dd/ccyy 06/13/2025 |

**PLACE OF DEATH**

| 103. PLACE OF DEATH RESIDENCE | 104. COUNTY LASSEN | 105. FACILITY ADDRESS OR LOCATION 475-750 RICE CANYON RD. | 106. CITY SUSANVILLE |
|---|---|---|---|
| | [X] Decedent's Home | | |

**CAUSE OF DEATH**

| 107. CAUSE OF DEATH | | Time interval between onset and death | 108. WAS AUTOPSY PERFORMED? |
|---|---|---|---|
| IMMEDIATE CAUSE (A) PENDING TOXICOLOGY | | | [X] NO |
| Sequentially list conditions, if any, leading to cause on line A. (B) | | | 110. WAS CORONER CONTACTED? [X] YES |
| (C) | | | 111. AUTOPSY PERFORMED? [X] YES |
| (D) | | | |

| 112. OTHER SIGNIFICANT CONDITIONS CONTRIBUTING TO DEATH BUT NOT RESULTING IN THE UNDERLYING CAUSE GIVEN IN 107 NONE |
|---|

| 113. WAS OPERATION PERFORMED FOR ANY CONDITION IN ITEM 107 OR 112? NO |
|---|

**PHYSICIAN'S CERTIFICATION**

| 114. I CERTIFY THAT TO THE BEST OF MY KNOWLEDGE DEATH OCCURRED AT THE HOUR, DATE, AND PLACE STATED FROM THE CAUSES STATED. | 115. SIGNATURE AND TITLE OF CERTIFIER ▶ | 116. LICENSE NUMBER | 117. DATE mm/dd/ccyy |
|---|---|---|---|
| | 118. TYPE ATTENDING PHYSICIAN'S NAME, MAILING ADDRESS, ZIP CODE | | |

**CORONER'S USE ONLY**

| 119. I CERTIFY THAT IN MY OPINION DEATH OCCURRED AT THE HOUR, DATE, AND PLACE STATED FROM THE CAUSES STATED. | 120. INJURED AT WORK? | 131. INJURY DATE mm/dd/ccyy | 132. HOUR 24 Hours |
|---|---|---|---|
| 119. MANNER OF DEATH [X] Pending Investigation | | | |
| 123. PLACE OF INJURY | | | |

| 124. DESCRIBE HOW INJURY OCCURRED |
|---|

| 125. LOCATION OF INJURY |
|---|

| 126. SIGNATURE OF CORONER / DEPUTY CORONER ▶ LAURA M JOHNSON | 127. DATE mm/dd/ccyy 06/13/2025 | 128. TYPE NAME, TITLE OF CORONER / DEPUTY CORONER LAURA M JOHNSON, CORONER |
|---|---|---|

| STATE REGISTRAR | A | B | C | D | E | FAX AUTH # | CENSUS TRACT |
|---|---|---|---|---|---|---|---|

**CERTIFIED COPY OF VITAL RECORDS**

STATE OF CALIFORNIA } ss.
COUNTY OF LASSEN

DATE ISSUED **FEB - 9 2026**

0 0 0 0 8 0 2 0 0

This is a true and exact reproduction of the document officially registered and placed on file with the LASSEN COUNTY CLERK-RECORDER.

*JULIE BUSTAMANTE*
LASSEN COUNTY CLERK-RECORDER

This copy not valid unless prepared on engraved border displaying seal and signature of County Clerk-Recorder.



ANY ALTERATION OR ERASURE VOIDS THIS CERTIFICATE

# COUNTY OF LASSEN
### SUSANVILLE, CALIFORNIA 96130

## PHYSICIAN/CORONER'S AMENDMENT
NO ERASURES, WHITEOUTS, PHOTOCOPIES, OR ALTERATIONS

3052025129287
STATE FILE NUMBER

3202518000082
LOCAL REGISTRATION NUMBER

1.1 ☐ BIRTH ☒ DEATH ☐ FETAL DEATH

TYPE OR PRINT CLEARLY IN BLACK INK ONLY – THIS AMENDMENT BECOMES AN ACTUAL PART OF THE OFFICIAL RECORD

### PART I   INFORMATION TO LOCATE RECORD

| INFORMATION AS IT APPEARS ON ORIGINAL RECORD | 1A. NAME—FIRST JOSEPH | 1B. MIDDLE WESLEY | 1C. LAST REAGAN | 2. SEX M |
|---|---|---|---|---|
| | 3. DATE OF EVENT—MM/DD/CCYY 06/10/2025 | 4. CITY OF EVENT SUSANVILLE | 5. COUNTY OF EVENT LASSEN | |

### PART II   STATEMENT OF CORRECTIONS

| | 6. CERTIFICATE ITEM NUMBER | 7. INFORMATION AS IT APPEARS ON ORIGINAL RECORD | 8. INFORMATION AS IT SHOULD APPEAR |
|---|---|---|---|
| LIST ONE ITEM PER LINE | 107A | PENDING TOXICOLOGY | MULTIPLE SHARP FORCE INJURIES |
| | 107AT | - | MINUTES |
| | 119 | PENDING INVESTIGATION | HOMICIDE |
| | 120 | | N |
| | 121 | | 06/10/2025 |
| | 122 | | 1841 EST |
| | 123 | | SCHOOL, OTHER INSTITUTIONAL OR PUBLIC ADMINISTRATIVE AREA |
| | 124 | | STABBED BY ANOTHER PERSON |
| | 125 | | HIGH DESERT STATE PRISON 475-750 RICE CANYON RD, SUSANVILLE, CA 96130 |

`2 of 2`

I HEREBY DECLARE UNDER PENALTY OF PERJURY THAT THE ABOVE INFORMATION IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE.

| DECLARATION OF CERTIFYING PHYSICIAN OR CORONER | 9. SIGNATURE OF CERTIFYING PHYSICIAN OR CORONER ► LAURA M JOHNSON | 10. DATE SIGNED—MM/DD/CCYY 09/03/2025 | 11. TYPED OR PRINTED NAME AND TITLE/DEGREE OF CERTIFIER LAURA M JOHNSON, CORONER |
|---|---|---|---|
| | 12. ADDRESS—STREET AND NUMBER 1415 SHERIFF CADY LANE | 13. CITY SUSANVILLE | 14. STATE CA | 15. ZIP CODE 96130-4567 |

| STATE/LOCAL REGISTRAR USE ONLY | 16. OFFICE OF VITAL RECORD OR LOCAL REGISTRAR ► CDPH-VR | 17. DATE ACCEPTED FOR REGISTRATION—MM/DD/CCYY 09/03/2025 |
|---|---|---|

STATE OF CALIFORNIA, DEPARTMENT OF PUBLIC HEALTH, OFFICE OF VITAL RECORDS

FORM VS 24Aa (REV. 1/08)

1.1

## CERTIFIED COPY OF VITAL RECORDS

STATE OF CALIFORNIA
COUNTY OF LASSEN } SS.   DATE ISSUED **FEB - 9 2026**

000080201

This is a true and exact reproduction of the document officially registered and placed on file with the LASSEN COUNTY CLERK-RECORDER.

JULIE BUSTAMANTE
LASSEN COUNTY CLERK-RECORDER

This copy not valid unless prepared on engraved border displaying seal and signature of County Clerk-Recorder.

PRSCO (Rev) 0014

ANY ALTERATION OR ERASURE VOIDS THIS CERTIFICATE

